UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

PALADYNE SYSTEMS, Inc., a Delaware                    Case No. 07 CIV 8421 (LAP)
Corporation,

                              Plaintiff,

v.

STPENABLE, LTD., a United Kingdom
Company

-----------------------------------------------------------x

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
### TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

SPEARS & IMES LLP
David Spears
Sara L. Shudofsky
Debra A. Karlstein
Justin Deabler
51 Madison Avenue
New York, New York  10010
Tel.: (212) 213-6996
Fax: (212) 213-0849

*Attorneys for Defendant STPenable, Ltd.*

**TABLE OF CONTENTS**

**PAGE**

Preliminary Statement ..................................................................................... 1

Statement of Facts .......................................................................................... 3

    A.   Wynter's Background .......................................................................... 3

    B.   The Management of Financial Market Data, and STPenable's
          Transformer Product. ........................................................................ 4

    C.   Golden Copy Databases ....................................................................... 5

    D.   STPenable's Development of an Original Golden Copy .................... 6

    E.   The Lipper License Agreement .......................................................... 7

    F.   The Advent Software Agreement. ...................................................... 9

    G.   The Financial Consequences to STPenable of a Preliminary Injunction .......... 9

ARGUMENT:   THE COURT SHOULD LIFT THE TEMPORARY RESTRAINING
                  ORDER AND DENY PLAINTIFF'S APPLICATION FOR A
                  PRELIMINARY INJUNCTION ................................................. 10

    A.   Legal Standard .................................................................................. 10

    B.   Paladyne Has Not Demonstrated That It Will Be Irreparably Harmed ............ 10

    C.   Paladyne Has Failed to Demonstrate a Likelihood of Success on the Merits
          of Any of Its Claims ......................................................................... 13

          1.   The Trade Secret Claim ............................................................ 13

                a.   Paladyne's Golden Copy Database Is Not a Trade Secret ......... 13

                b.   Even If Paladyne's Version of the Golden Copy Is a Trade
                    Secret, STPenable Did Not Misappropriate It ........................... 20

          2.   The Breach of Contract Claim ................................................. 24

          3.   The Unfair Competition Claim ................................................ 25

D.    Paladyne Has Failed to Raise Sufficiently Serious Questions Going to the
Merits to Make Them a Fair Ground for Litigation, and the Balance of
Hardships Tips Decidedly in Favor of STPenable ..........................................25

CONCLUSION .................................................................................................................27

## TABLE OF AUTHORITIES

*Albert v. Avery, Inc.*,
    724 F. Supp. 245 (S.D.N.Y. 1989) ........................................................................ 26

*Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*,
    No. 05 Civ. 8988 (GEL), 2007 WL 1732427 (S.D.N.Y. June 14, 2007) ........................ 25

*Ashland Mgmt. Inc. v. Janien*,
    82 N.Y.2d 395 (1993) ...................................................................................... 16-17

*Century Time Ltd. v. Interchron Ltd.*,
    729 F.Supp. 366 (S.D.N.Y. 1990) .......................................................................... 12

*Downloadcard, Inc. v. Universal Music Group, Inc.*,
    No. 02 Civ. 7710 (CSH), 2002 WL 31662924 (S.D.N.Y. Nov. 26, 2002) .................. 15, 18

*Fin. Tech. Int'l, Inc. v. Smith*,
    247 F. Supp.2d 397 (S.D.N.Y. 2002) ...................................................................... 18

*Frink Am., Inc. v. Champion Road Machinery Ltd.*,
    48 F. Supp.2d 198 (N.D.N.Y. 1999) ........................................................................ 20

*Gillespie & Co. of New York, Inc. v. Weyerhaeuser Co.*,
    533 F.2d 51 (2d Cir. 1976) .................................................................................. 16

*Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc.*,
    920 F.2d 171 (2d Cir. 1990) ................................................................................ 13

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995) .................................................................................... 26

*Julie Research Lab., Inc. v. Select Photographic Engineering, Inc.*,
    810 F. Supp. 513 (S.D.N.Y. 1992), *aff'd in part and vacated in part*,
    998 F.2d 65 (2d Cir. 1993) ........................................................................ 14, 15, 18

*Kadant, Inc. v. Seeley Machine, Inc.*,
    244 F. Supp.2d 19 (N.D.N.Y. 2003) ................................................................ 14, 23-27

*Lanvin Inc. v. Colonia, Inc.*,
    739 F. Supp. 182 (S.D.N.Y. 1990) .......................................................................... 12

*Legal Sea Foods, Inc. v. Calise,*
  No. 03 Civ. 4958 (DLC), 2003 WL 21991588 (S.D.N.Y. Aug. 20, 2003),
  *vacated by joint motion of parties*, 2005 WL 319160 (S.D.N.Y. June 2, 2005) ............................ 17

*Leo Silfen, Inc. v. Cream,*
  29 N.Y.2d 387 (1972) ................................................................................................................ 17

*LinkCo, Inc. v. Fujitsu Ltd.,*
  230 F. Supp.2d 492 (S.D.N.Y. 2002) ....................................................................................... 25

*Marks v. New York University,*
  61 F. Supp.2d 81 (S.D.N.Y. 1999) ........................................................................................... 24

*North Atlantic Instruments, Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999) ................................................................................................. 10, 11

*Thin Film Lab, Inc. v. Comito,*
  218 F. Supp.2d 513 (S.D.N.Y. 2002) ....................................................................................... 17

*Tough Traveler, Ltd. v. Outbound Products,*
  60 F.3d 964 (2d Cir. 1995) ................................................................................................. 11, 12

*Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC,*
  80 F. Supp.2d 25 (N.D.N.Y. 1999) ..................................................................................... 12, 17

Defendant STPenable, Ltd. ("STPenable"), by its attorneys, Spears & Imes LLP, respectfully submits this memorandum of law in opposition to the order to show cause for a temporary restraining order and preliminary injunction brought by plaintiff Paladyne Systems, Inc. ("Paladyne").

## Preliminary Statement

Paladyne's motion for a preliminary injunction should be denied because it has failed to meet its burden of establishing the grounds necessary for the imposition of such drastic relief.

First, Paladyne cannot benefit from any presumption of irreparable injury that might otherwise arise in a trade secret case because of its inordinate delay in seeking to protect its proprietary interests. Specifically, its failure to seek an injunction *six months ago* – when Paladyne claims to have learned that STPenable sold its trade secrets to a company called Lipper Ltd. ("Lipper") – fatally undercuts any urgency in its request for relief and thereby any claim that the injury it faces is irreparable. Having stood on the sidelines six months ago while its trade secrets were allegedly sold to another company, Paladyne cannot now claim that it needs immediate relief to avoid irreparable injury. Accordingly, Paladyne's motion fails at the outset because it has not demonstrated the harm necessary for the imposition of injunctive relief.

Nor has Paladyne demonstrated a likelihood of success on the merits of any of its claims. As to its trade secret claim, it has failed to meet its burden of demonstrating that its version of the golden copy database is in fact a trade secret. Contrary to the misleading impression conveyed by Paladyne's papers, the term "golden copy" is not a unique or proprietary term; golden copy databases are used throughout the securities industry.

Paladyne's database, moreover, consists almost entirely of publicly-available data that is readily ascertainable, culled from information provided by subscription feeds from vendors like Bloomberg and Reuters. Paladyne has not come close to meeting its burden of identifying what in particular about its version of a technology that is widespread in the securities industry is unique or proprietary. Accordingly, it has not demonstrated that its database is sufficiently secret to merit trade secret protection.

Further, Paladyne has not demonstrated that STPenable misappropriated any aspect of Paladyne's golden copy database. STPenable's founder, David Wynter, an experienced software designer and data modeler with thirty years of experience and a strong background in the financial issuers and securities that are the subject of a golden copy database, created his own version of a golden copy database within a month's time, and it is that new and unique product that STPenable markets and licenses to customers. Paladyne relies almost exclusively on the inference that because Wynter was exposed to its golden copy, he must have stolen it. That showing is simply inadequate to justify a preliminary injunction in the absence of specific allegations identifying what STPenable purportedly took from Paladyne's golden copy model and why it is entitled to trade secret protection. In fact, STPenable's golden copy database itself disproves Paladyne's allegation, because it does not have in common with Paladyne's model any element that could be claimed as a trade secret. Accordingly, Paladyne has not shown a likelihood of success on the merits of this claim. For the same reasons, Paladyne has also failed to demonstrate a likelihood of success on the merits of either its contract claim or its unfair competition claim.

Finally, the balance of hardships here tips decidedly in STPenable's favor. Paladyne is a sizeable company, with seventy-five employees, numerous clients, and an expected

2

revenue this year of ten million dollars. Its claimed potential injury is highly speculative, and in any event could be compensated by monetary damages were it to ultimately prevail on the merits. In sharp contrast, STPenable is a very small company, with a single employee and only a handful of clients. An injunction curtailing its ability to use its own golden copy database would be absolutely devastating to its business; indeed, imposition of an injunction would cripple STPenable financially. The balance of hardships therefore weighs heavily in its favor.

Because Paladyne has not demonstrated irreparable injury, and in any event has not demonstrated either a likelihood of success on the merits of its claims or that the hardships tip decidedly in its favor, its motion for a preliminary injunction should be denied and STPenable should be permitted to return to its business.

### Statement of Facts

The facts pertaining to STPenable's opposition to Paladyne's motion are set forth in the Declaration of David Wynter ("Wynter") dated October 17, 2007 ("Wynter Dec."). Those facts are summarized in part below.

**A.      Wynter's Background**

Wynter is the Managing Director of STPenable, a software designer and consultant that, among other things, markets and sells a unique "golden copy" database. Wynter Dec. ¶ 1. Wynter has nearly thirty years of practical experience in the areas of computer programming and systems, as an architect, designer, and data modeler of systems and software. *Id.* ¶ 5; *see id.* ¶¶ 6-10. Through the years, he has provided computer consulting services to many companies, among them Reuters, with whom he consulted for nearly two years on various projects and products, including its financial data feeds; in the course of his

3

work for Reuters, Wynter became very familiar with Reuters' subscription data feed products. *Id.* ¶¶ 7, 8.

Since 1999, Wynter has been the managing director and architect of defendant STPenable. *Id.* ¶ 10. In that business, he has designed (and supervised outside consultants in the creation and development of) various software products, including Transformer, discussed below. *Id.*

**B.    The Management of Financial Market Data, and STPenable's Transformer Product**

This case involves software used by securities trading organizations such as broker-dealers and hedge funds. *Id.* ¶ 11. In order to obtain information about stocks, bonds, and other securities bought and sold on the financial markets, those entities subscribe to pay services (such as Bloomberg and Reuters) that provide "feeds" of market data. *Id.* The market data feeds offer a variety of information about the issuer of a security, the type of instrument, the price at which a security last traded, corporate actions (*e.g.*, stock splits), and the like. *Id.*

Because the various pay services provide slightly different information in somewhat different formats, there is a need in the marketplace for software to organize and compare the data received from the multiple feeds. *Id.* ¶ 12. STPenable has designed and markets a product called Transformer, which gathers information from multiple sources regarding securities such as stocks, bonds, options, futures, and indices. *Id.* Specifically, Transformer compiles information about the issuer, the type of security, trading prices, and corporate events. *Id.* ¶ 13. In addition, Transformer "cleans" the data (ensuring that information coming from various sources is consistent), and prepares it for uploading into other software

applications. *Id.* A brochure describing Transformer is annexed to the Wynter Declaration as Exhibit A. *Id.*

STPenable and Paladyne entered into the Solution Integrator Agreement (the "Agreement") on November 1, 2005, which gives Paladyne a non-exclusive license to use Transformer. *Id.* ¶ 14. A copy of that agreement has been filed under seal as Exhibit A to the Declaration of Sameer Shalaby dated September 27, 2007 ("Shalaby Dec."). Section 2.4 of the parties' agreement provides that "STPenable owns all the global Intellectual Property ('Transformer IP') rights to STPenable Transformer product and associated templates and any newly developed additional or derivatives components of that product or templates." Wynter Dec. ¶ 15. On information and belief, Paladyne has incorporated Transformer into its security master software, a viewing application marketed to hedge funds that allows a user to view and search the data gathered by Transformer. *Id.* ¶ 16.

**C.    Golden Copy Databases**

The term "golden copy" is not unique or proprietary to Paladyne. *Id.* ¶ 17. Generically, the phrase "golden copy" is used to refer to the official, master version of a record. *Id.* In the securities industry, the term "golden copy" is used to refer to a compilation of trusted data assembled from multiple sources. *Id.* ¶ 18. In addition to Paladyne, there are any number of companies offering data management software to the financial services industry that provide the ability to produce a golden copy database, including Asset Control, SunGard, AIM Software, and Golden Source. *Id.* ¶ 19. A computer data modeler with a high level of technical expertise, who also has a strong background in the financial issuers and securities that are the subject of a golden copy database, could create his own original version of a golden copy within a matter of weeks. *Id.* ¶ 27.

**D.      STPenable's Development of an Original Golden Copy**

In the course of fulfilling his contractual duties under the Agreement, Wynter was exposed to, and became familiar with, Paladyne's golden copy database. *Id.* ¶ 21. At one time, Wynter believed that Paladyne's golden copy was subject to shared ownership with STPenable pursuant to section 2.5 of the parties' agreement. *Id.* ¶ 21. That is so because in the course of his work for Paladyne under the Agreement, Wynter was involved in numerous discussions about the evolution of its golden copy database, and Paladyne requested and paid for Wynter to develop portions of the golden copy model relating to corporate actions. *Id.* ¶ 22. Accordingly, throughout the first half of 2006, Wynter believed that Paladyne's golden copy was subject to shared, or joint, ownership under the Agreement. *Id.* In an instant messaging "chat" conversation with Paladyne employee Vladimir Agranov in July 2006, Wynter learned for the first time that Paladye did not consider the golden copy database to be jointly owned with STPenable. *Id.* ¶ 23.

Immediately thereafter, Wynter set out to create a new golden copy model from the ground up. *Id.* ¶ 24. This new and unique golden copy – *not* Paladyne's golden copy – is currently in the possession of a single customer, Lipper. *Id.* The data contained therein is obtained almost exclusively from third-party subscription services such as Bloomberg and Reuters – not from Paladyne. *Id.* STPenable does not use Paladyne's golden copy, nor does it use any of Paladyne's confidential or proprietary information in connection with Lipper's software. *Id.* ¶ 31.

In connection with the creation of a brand new golden copy, Wynter spent approximately one month creating an original schema (or design) containing over 1,040 columns for collecting data. *Id.* ¶ 25. The tables in the database represent well-documented information from the financial world that can be accessed on the Internet, from numerous

6

books on financial markets, and from the market data vendors' own documentation (over
2,000 pages of which Wynter reviewed as a basis for his design). *Id.* As noted above,
Wynter has nearly thirty years of practical experience in computer programming and
software, *id.* ¶ 5, and he has built databases "from the ground" up on numerous occasions in
the past, *id.* ¶ 27. In addition, through his consulting work at Reuters and in developing
Transformer for STPenable, Wynter has amassed comprehensive knowledge about the
financial issuers and securities that are the subject of the golden copy database. *Id.*

**E.      The Lipper License Agreement**

STPenable currently has only one customer using its golden copy model – Lipper, as
noted above. *Id.* ¶ 31. By its own admission, Paladyne has been aware of STPenable's
licensing agreement with Lipper since at least "early Spring 2007," if not earlier, but did not
seek injunctive relief (or take any other legal action) in response to that information. Shalaby
Dec. ¶¶ 21-24; Declaration of Vladimir Agranov ("Agranov") dated September 27, 2007
("Agranov Dec.") ¶¶ 7-10.

STPenable does not use Paladyne's golden copy, nor does it use any of Paladyne's
confidential or proprietary information, in connection with Lipper's software. Wynter Dec.
¶ 31. When Wynter first began work for Lipper in June 2006, he briefly loaded onto a
development machine at Lipper a version of the golden copy that contained the schema from
Paladyne's model – although even then the mechanism for loading the database was
completely different. *Id.* ¶ 32. In July 2006, as noted above, Wynter learned that Paladyne
was taking the position that the golden copy was not jointly owned with STPenable;
accordingly, within a month, he substituted the brand new golden copy database that he had
created for STPenable, overwriting and deleting from Lipper's computer the initial version.
*Id.*

The differences between Paladyne's product and the one that STPenable licenses to Lipper are abundant. *Id.* ¶ 34. First, Lipper does not have a viewing application like the security master software that Paladyne provides. *Id.* ¶ 35. Second, with respect to the architecture and business logic of the golden copy, Wynter uses "standard query language," a common, non-proprietary programming language, to communicate between Transformer and the golden copy database. *Id.* ¶¶ 36-37. Paladyne, by contrast, uses Microsoft's SQL Server database stored procedures. *Id.* ¶ 38. Wynter had told Paladyne in the course of his work with the company that he did not think it was a good idea to use stored procedures because they did not have the performance required to load the high volumes involved, and because the Microsoft stored procedure language is unique to Microsoft and therefore would not allow for independence from the brand of the database. *Id.* Nonethless, Paladyne decided to use stored procedures. *Id.* When Wynter later created his own new golden copy for STPenable, he did not do so. *Id.* Further, Paladyne's stored procedures are incorporated within the golden copy database itself, whereas the standard query language and Java code utilized by STPenable to load its golden copy resides outside of the database. *Id.* ¶ 39.

Moreover, Paladyne's golden copy includes data about securities – such as swaps and baskets – for which subscription information on pricing, terms, and conditions is not available; STPenable's golden copy contains none of this material. *Id.* ¶ 40. In addition, STPenable's golden copy contains information relating to municipal bonds and mortgage-backed and asset-backed securities that does not appear in Paladyne's golden copy. *Id.* ¶ 41. Wynter derived this information from a Reuters database that, to the best of his knowledge, Paladyne does not receive. *Id.*

8

Although some elements of the two golden copy databases overlap, they do not do so with respect to any aspects of the golden copy that Paladyne could claim as confidential. *Id.* ¶ 42. There exists a finite number of categories of assets within the financial markets; anyone with an Internet connection can learn from publicly-available sources what the types of securities (or asset classes) are and what attributes are unique to each of them. *Id.* Accordingly, STPenable's golden copy and Paladyne's golden copy necessarily both contain information structured to record these same categories of assets and their unique attributes. *Id.*

**F.      The Advent Software Agreement**

STPenable has had dealings with Advent Software ("Advent"), the details of which are subject to a confidentiality agreement; specifically, they have negotiated about a possible business combination. *Id.* ¶ 43. Advent first approached Wynter in December 2006 through the STPenable website's online contact form. *Id.* ¶ 45. By the time Wynter met Advent in December 2006, STPenable had been using its own unique golden copy for months – since July 2006 – and it is this original golden copy that STPenable would develop and customize for Advent, and license to it. *Id.* ¶ 46.

**G.      The Financial Consequences to STPenable of a Preliminary Injunction**

As discussed above, STPenable has not disclosed Paladyne's golden copy to Lipper, Advent, or any other prospective customer. *Id.* ¶ 54.

STPenable is a small company; Wynter is its sole employee, and he has few customers. *Id.* ¶ 55. His business absolutely depends upon the ability to service Lipper, to go forward with Advent, and to solicit new clients. *Id.* A preliminary injunction that would prevent Wynter from using his own golden copy database pending the outcome of plaintiff's arbitration would cripple STPenable and quite possibly result in bankruptcy. *Id.*

## ARGUMENT

## THE COURT SHOULD LIFT THE TEMPORARY RESTRAINING ORDER AND DENY PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

### A.    The Legal Standard

To obtain a preliminary injunction, a plaintiff must demonstrate: (1) that it will suffer irreparable harm absent injunctive relief, and (2) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in its favor. *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999).  As discussed below, Paladyne has not met its burden with respect to either of these two prongs, and its application for a preliminary injunction should be denied.

### B.    Paladyne Has Not Demonstrated That It Will Be Irreparably Harmed

Paladyne cannot get past the first prong of the inquiry, because it has not demonstrated the irreparable harm necessary to justify the imposition of preliminary injunctive relief.

In its brief, Paladyne correctly notes that a presumption of irreparable harm arises if a plaintiff demonstrates a likelihood of success on its claim for misappropriation of a trade secret.[1]  For all the reasons discussed *infra* Section C, Paladyne has not made that showing. But the presumption would not in any event apply here because Paladyne's failure to seek an injunction six months ago – when it allegedly learned that STPenable had sold Paladyne's trade secrets to another company – negates any purported need for immediate relief.  As the Second Circuit has held in the parallel context of a trade dress infringement action:

---

[1]     *See* Memorandum of Law in Support of Order to Show Cause for Temporary Restraining Order and Preliminary Injunction Against STPenable, Ltd. ("Pl. Mem.") at 20.

> [A]ny . . . presumption of irreparable harm is inoperative if the
> plaintiff has delayed either in bringing suit or in moving for
> preliminary injunctive relief.  Though such delay may not
> warrant the denial of ultimate relief, it may, standing alone, . . .
> preclude the granting of preliminary injunctive relief, because
> the failure to act sooner undercuts the sense of urgency that
> ordinarily accompanies a motion for preliminary relief and
> suggests that there is, in fact, no irreparable injury.

*Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (citations and

quotations omitted).

That is emphatically the case here.  As is clear from its own submissions, Paladyne

learned sometime in "early Spring 2007" that STPenable had entered into a licensing

agreement with Lipper for technology that included what Paladyne believed to be its own

proprietary "Golden Copy" database.  Shalaby Dec. ¶ 21; Agranov Dec. ¶¶ 7-8; Complaint

¶ 25.  Nevertheless, despite its awareness of the Lipper licensing agreement and specifically

that another company had just acquired what it regarded as its trade secrets, Paladyne took no

legal action to safeguard its allegedly valuable proprietary information.  *See* Shalaby Dec.

¶ 24.  Paladyne now offers assorted rationales for its failure to act, including that Lipper is

not a hedge fund and therefore not in Paladyne's core market.  *See id.*  None of these belated

excuses can overcome the dispositive fact that Paladyne believed *at the time* – in early Spring

2007 – that STPenable had "stolen" Paladyne's property and "sold it as its own product," *id.*

¶ 21; Complaint ¶¶ 25, 26, yet failed to seek injunctive relief in order to protect its interests.

The principle underlying the presumption of irreparable injury in a trade secret case is that

such a secret, once lost, is "lost forever."  *See North Atlantic Instruments*, 188 F.3d at 49

(citation and quotation omitted).  Here, by Paladyne's own lights, its trade secrets were "lost"

to Lipper in early Spring 2007, and Paladyne chose to do nothing.  Having remained idle

while its "Golden Copy" was allegedly shared with another company, Paladyne cannot now

11

come into court, some six months later, claiming that drastic relief is necessary to stave off imminent harm.

Because Paladyne's failure to seek an injunction when it first learned of the sale of its alleged trade secrets fatally "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief," rendering any presumption of irreparable harm "inoperative," Paladyne's motion should be denied. *See Tough Traveler*, 60 F.3d at 968 (reversing grant of preliminary injunction on that basis) (quotation omitted); *Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*, 80 F. Supp.2d 25, 34-35 (N.D.N.Y. 1999) ("lengthy delay [of seven months] between [plaintiff's] learning of the possible misappropriation and filing the Complaint and Order to Show Cause is enough to defeat Plaintiff's motion for a preliminary injunction"); *Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 369 (S.D.N.Y. 1990) (denying application for temporary restraining order on balance of hardship grounds, but noting that plaintiff, who waited six months to seek preliminary injunction in trade dress infringement case, was "unlikely to be able to demonstrate the requisite irreparable harm"); *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192 (S.D.N.Y. 1990) (holding, in dispute over breach of licensing agreement, that seven-month delay, even if it does not rise to the level of laches, demonstrates lack of need for speedy action, warranting denial of motion for preliminary injunction).

**C.**    **Paladyne Has Failed to Demonstrate a Likelihood of Success on the Merits of Any of its Claims**

**1.**    **The Trade Secret Claim**

To establish the misappropriation of a trade secret under New York law,[2] a plaintiff must prove that: "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation and quotation omitted).  As discussed below, Paladyne has not demonstrated either that its version of the golden copy is a trade secret or that STPenable has been using any aspect of it.  Accordingly, Paladyne has failed to establish a likelihood of success on its trade secret claim.

**a.**    **Paladyne's Golden Copy Database Is Not a Trade Secret**

First and most fundamentally, Paladyne has failed to meet its burden of establishing that its version of the golden copy database is entitled to trade secret protection.

Courts assess six factors in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by it to guard the secrecy of the information; (4) the value of the information to it and to its competitors; (5) the amount of effort or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See id.* at 173 (quoting Restatement of Torts § 757, comment b).  In assessing these factors, "[o]f primary overall importance is whether the information was secret," and the "primary consideration in determining secrecy is whether

---

2    New York law governs here pursuant to Article 11.1(a) of the parties' November 1, 2005 Solution Integrator Agreement. *See* Shalaby Dec., Ex. A.

13

the information is easily ascertainable by the public." *Kadant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp.2d 19, 35-36 (N.D.N.Y. 2003) (citations and quotation omitted).

Paladyne's trade secret claim fails at the threshold because factor number three in the analysis – "the extent of measures taken by plaintiff to guard the secrecy of the information" – is fatal to its claim. As discussed *supra* Section B, Paladyne learned sometime in "early Spring 2007," if not sooner, that STPenable had entered into a licensing agreement with Lipper for technology that included what Paladyne believed to be its own golden copy database. Shalaby Dec. ¶ 21. By its own admission, Paladyne believed at that time that STPenable had "improperly and unlawfully copied and/or replicated Paladyne's confidential and proprietary Golden Copy and sold it as its own product." *Id.* Nevertheless, despite its awareness of the licensing agreement and specifically its belief that Lipper now had access to its "Golden Copy," Paladyne took no legal action to safeguard its allegedly valuable proprietary information. *See id.* ¶ 24. Its current, belated effort to protect its database must therefore fail "because of the deficiency of its efforts to maintain secrecy," *Julie Research Lab., Inc. v. Select Photographic Engineering, Inc.*, 810 F. Supp. 513, 520 (S.D.N.Y. 1992), *aff'd in part and vacated in part on other grounds*, 998 F.2d 65 (2d Cir. 1993). In short, having stood on the sidelines as the proverbial cat came out of the bag, Paladyne cannot now claim that its version of the golden copy somehow merits trade secret protection.

Nor has Paladyne made a sufficient showing with respect to the first, second, or sixth factors in the analysis, going to whether the information was widely known "outside of the plaintiff's business" and by people "involved in its business," and could easily have been "acquired or duplicated by others." As an initial matter, Paladyne has not even identified its alleged trade secret with sufficient particularity to enable the court to assess the applicable

14

factors. The "burden . . . is on the plaintiff to define or identify in detail the trade secret or proprietary information it alleges has been misappropriated" by a defendant. *Julie Research Lab.*, 810 F. Supp. at 519. Paladyne's vague and overbroad allegations do not come close to meeting this burden. Instead, Paladyne invokes the term "Golden Copy" talismanically, misleadingly suggesting that the term itself is unique or proprietary and that mere reference to it eliminates the need to specify what elements of the database might be proprietary in nature. The term "golden copy," however, is not unique or proprietary. Rather, the term is used generically to refer to the official, master version of a record. Wynter Dec. ¶ 17. In the securities industry in particular, the term "golden copy" is used to refer to a compilation of trusted data assembled from multiple sources. *Id.* ¶ 18. Consistent with the general importance of the golden copy as a widely-used tool in the securities industry, numerous companies offering data management software to the industry provide golden copy databases. *Id.* ¶ 19. Moreover, a computer data modeler with a high level of technical expertise, who also has a strong background in the financial issuers and securities that are the subject of a golden copy database, could create his own original version of a golden copy within a matter of weeks. *Id.* ¶ 27.

Courts have declined to accord trade secret protection where the technology at issue is widespread and insufficiently unique to warrant trade secret status. In *Downloadcard, Inc. v. Universal Music Group, Inc.*, No. 02 Civ. 7710 (CSH), 2002 WL 31662924 (S.D.N.Y. Nov. 26, 2002), for example, plaintiff claimed that defendants had misappropriated its system for managing and tracking customers using personal identification numbers, or PINs. The court denied plaintiff's application for a preliminary injunction, noting that "the use of PINs is widespread and did not originate with [plaintiff]"; that PINs are "essential to the

15

functionality of the Internet," and that many other consumer product companies "have

similarly adapted . . PIN technology for use in a variety of on-line promotions." *Id.* at *4

(quotations omitted). "Given the widespread use of PINs," the court found, "it is doubtful

that [plaintiff] can build a case for a trade secret on *any* of the six factors used in identifying

a trade secret, let alone all six." *Id.* (emphasis in original). The same holds true for

Paladyne's golden copy database , which is merely Paladyne's version of a database whose

generic use is widespread in the financial services industry.

      Moreover, Paladyne's database consists almost entirely of publicly-available data that

is readily available through numerous subscription services – and therefore certainly not

"secret." Paladyne's golden copy database consists almost exclusively of information culled

from publicly-available information via subscription data feeds like Bloomberg, Reuters, and

other vendors.[3] Wynter Dec. ¶ 29. This means that the information at issue is widely known

"outside of [Paladyne's] business" and by people "involved in [Paladyne's] business," and

could easily be "acquired or duplicated by others," militating heavily against trade secret

protection under the first, second, and sixth factors of the trade secret analysis. *See, e.g.,*

*Gillespie & Co. of New York, Inc. v. Weyerhaeuser Co.*, 533 F.2d 51, 53 (2d Cir. 1976)

(affirming denial of preliminary injunction where customer lists alleged to be trade secrets

were readily ascertainable from public listings); *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d

395, 407-08 (1993) ("in view of the ease with which others could acquire and duplicate the

---

[3]    Only a very small percentage of the Paladyne database was derived from information
other than publicly-available data feeds. Wynter Dec. ¶ 29. Specifically, as discussed *infra*
Section C.1(b), Paladyne's golden copy includes data about securities – such as swaps and
baskets – for which subscription information on pricing, terms, and conditions is not
available. *Id.* ¶ 40. STPenable's golden copy contains none of this material. *Id.* Further,
information about swaps, baskets, and all other asset classes reflected in Paladyne's golden
copy can be found in hundreds of books on corporate finance and financial investments. *Id.* ¶
29.

information, [the software] was not a trade secret"); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d

387, 394-95 (1972) ("A trade secret, like any other secret, is nothing more than private

matter; something known to only one or a few and kept from the general public; and not

susceptible to general knowledge."); *Legal Sea Foods, Inc. v. Calise*, No. 03 Civ. 4958

(DLC), 2003 WL 21991588, at *4 (S.D.N.Y. Aug. 20, 2003), *vacated by joint motion of*

*parties*, 2005 WL 319160 (S.D.N.Y. June 2, 2005) (denying trade secret protection where

court "cannot tell what aspects in particular [plaintiff] relies on as proprietary and how they

differ from general and commonly-known . . . techniques and procedures"); *Thin Film Lab,*

*Inc. v. Comito*, 218 F. Supp.2d 513, 527-29 (S.D.N.Y. 2002) (no trade secret protection

where product or process is widely known within relevant industry and where a defendant

would know of it "in light of [defendant's] own experience, understanding of industry

practice, and use of" same tools); *Worldwide Sports*, 80 F. Supp.2d at 31 (use of ingredients

commonly known in industry weighs against trade secret status).

Paladyne has also failed to show that it has somehow arranged or combined publicly-

available elements in a way that confers trade secret protection upon the database. Its

attempt to make such a showing is found in two paragraphs of the Shalaby Declaration, in

which he asserts that the golden copy, together with Paladyne's "user interface,"[4] is a

"unique product in the hedge fund market" and "the technology of its architecture, stored

processes and business logic is valuable intellectual property." Shalaby Dec. ¶7; *see id.* ¶ 13

(asserting that the golden copy "is an important and proprietary feature").

---

[4] "User interface" presumably refers to Paladyne's security master viewing application. To
the extent Paladyne's trade secret claim rests upon any synergy between its golden copy
database and the security master application (that allows users to view and sort data in the
database), the claim necessarily fails because Paladyne does not and cannot contend that
STPenable ever marketed anything even remotely resembling Paladyne's security master;
this case is solely about golden copy databases. *See* Wynter Dec. ¶ 2.

These vague and conclusory allegations, lacking any concrete detail, are insufficient
to establish the existence of proprietary information justifying trade secret protection. As
was the case in *Downloadcard*, 2002 WL 31662924, at * 4, where plaintiff "contended at
oral argument" on its application for a preliminary injunction "that its unique combination of
elements, which individually are public knowledge, comprises its trade secret," there "is no
evidence on the record to prove" that Paladyne's "combination of [elements] is sufficiently
unique to be a trade secret." *See also Fin. Tech. Int'l, Inc. v. Smith*, 247 F. Supp.2d 397, 411
(S.D.N.Y. 2002) (denying summary judgment where plaintiff described the alleged trade
secret as a "complex organizational structure and coordinated set of rules" for mapping
financial data into databases, but did "not elaborate on the purportedly confidential
components, or structure, of the product"; "[w]ithout a more concrete understanding of the
allegedly secret elements" of the product, "it is impossible for the [c]ourt to consider the
other factors in the trade secret analysis"); *Julie Research Lab.*, 810 F. Supp. at 519, 520
(denying trade secret protection after trial, where, *inter alia*, plaintiff "has failed to surmount
his threshold burden of . . . defining what the trade secret is for which protection is sought";
"At the time [of the preliminary injunction hearing,] the court did not focus on the fact that
plaintiff defined its trade secret in wholly conclusory terms").

Finally, the fourth and fifth factors in the trade secret analysis do not militate in favor
of Paladyne's claim.  Assessment of the fourth factor – the "value of the information to
plaintiff and to its competitors" – is largely a function of how unique and proprietary in
nature the information at issue is.  Here, for all the reasons discussed *supra*, Paladyne claims
protection for a type of database that is widely used in the securities industry and which is
based almost entirely upon publicly-available information, and it has failed to identify what

18

particular elements might warrant trade secret protection.  On these facts, Paladyne has certainly not established the "value" of its version of the golden copy.

As to the fifth factor – "the amount of effort or money expended by plaintiff in developing the information" – Paladyne's single-sentence offering regarding its expenditure of time and resources, *see* Agranov Dec. ¶ 12, is far too vague and conclusory to support its claim.  Tellingly, Paladyne does not assert that it spent four years to develop its *golden copy*; instead, it claims that the four years were spent to develop "a stable product" for "the Golden copy database."  *Id.*  As discussed in the Wynter Declaration, the vast majority of the alleged four years was surely spent building Paladyne's security master viewing application – not the golden copy database model.  Wynter Dec. ¶ 28.  On information and belief, Wynter believes that Agranov spent not more than a few months developing Paladyne's golden copy.  *Id.*  Moreover, it is not credible that it took Paladyne four years to develop a stable golden copy because approximately 97% of Paladyne's database consists of information culled from publicly-available information via subscription data feeds.  *Id.* ¶ 29.  Nor does Paladyne explain why it had to "utilize[e] several developers" to develop the database; whether its predecessor, a hedge fund, hired an experienced data modeler to do the job; or why the job took as long as it allegedly did.  *See* Agranov Dec. ¶ 12.  In fact, a golden copy database, especially one comprised almost completely of public information (as Paladyne's is), can be built by an experienced data modeler like STPenable in a matter of weeks.  *See* Wynter Dec. ¶ 27.  Accordingly, factor number five does not weigh in Paladyne's favor either.

In short, Paladyne simply has not established a likelihood of proving that its version of the golden copy database is "significantly distinctive or secret so as to merit trade secrecy

protection." *See Frink Am., Inc. v. Champion Road Machinery Ltd.*, 48 F. Supp.2d 198, 207 (N.D.N.Y. 1999).

       **b.**       **Even If Paladyne's Version of the Golden Copy**
                  **Is a Trade Secret, STPenable Did Not Misappropriate It**

For the reasons discussed supra Section C.1(a), Paladyne has not demonstrated a likelihood of proving that its version of the golden copy database is a trade secret. In any event, however, it has not demonstrated that STPenable misappropriated any aspect of Paladyne's golden copy database.

As explained in the Wynter Declaration, golden copy databases are routinely used in the securities industry, and experienced, technically expert data modelers with a strong background in the securities industry can within a short period of time create a database "from the ground up." Wynter Dec. ¶ 27. That is precisely what Wynter did here. *Id.* Set forth in his Declaration is the process he used to create an original golden copy database, containing data obtained almost exclusively from third-party subscription services such as Bloomberg and Reuters. *Id.* ¶ 24. In connection with the creation of a brand new golden copy, Wynter spent approximately one month creating an original schema (or design) containing over 1,040 columns for collecting data. *Id.* ¶ 25. The tables in the database represent well-documented information from the financial world that can be accessed on the Internet, from numerous books on financial markets, and from the market data vendors' own documentation (over 2,000 pages of which Wynter reviewed as a basis for his design). *Id.* To date, STPenable has licensed this new and unique golden copy to a single customer, Lipper.[5] *Id.* ¶ 24.

---

[5]    Notably, the parties' Agreement expressly excludes from its confidentiality provision "any information which ... was independently developed by the receiving party without the use or reliance on the disclosing party's Confidential Information ...." Shalaby Dec., Ex. A at § 9.1.

For its part, Paladyne has presented no evidence demonstrating that the means used by STPenable to create its own golden copy database was in any way improper. Instead, it relies almost exclusively upon the inference that STPenable must have stolen Paladyne's product because the creation of STPenable's golden copy database "occurred far too rapidly to contain an independently developed Golden Copy." Agranov Dec. ¶ 12. That assertion is insufficient to justify the drastic remedy of preliminary injunctive relief, particularly in the face of evidence from the Wynter Declaration that experienced data modelers can, and do, create these generic databases from publicly-available information in a matter of weeks, which is exactly what STPenable did here. *See* Wynter Dec. ¶ 27. Nor does Wynter's June 20, 2007 e-mail, *see* Shalaby Dec., Ex. B, support Paladyne's claim. Sent almost a full year year after Wynter had meticulously created his own golden copy database from the ground up, the e-mail merely reflects the reflexive fear of a one-man company contemplating the potentially severe financial consequences of a threatened litigation. *See* Wynter Dec. ¶¶ 49-50. In fact, however, STPenable did *not* buckle under to Paladyne's pressure tactics, choosing to defend itself against Paladyne's groundless charge that Wynter stole its trade secrets.

Moreover, the Wynter declaration makes clear that STPenable's model does not have in common with Paladyne's model any element that could be claimed as proprietary in nature. First, STPenable does not have a viewing application like the security master software that Paladyne provides. *Id.* ¶ 35. Second, the "architecture" and "business logic" of Paladyne's model is categorically different from that of STPenable's golden copy database. *Id.* ¶¶ 35-40. For example, STPenable uses "standard query language," a common, non-proprietary programming language, to communicate between Transformer and the golden

copy database; Paladyne, on the other hand, uses Microsoft's SQL Server database "stored procedures." *Id.* ¶¶ 37-38. Wynter, in fact, had told Paladyne in the course of their relationship that he did not think it was a good idea to use these stored procedures because (a) they did not have the performance required to load the high volumes involved; and (b) the Microsoft stored procedure language is unique to Microsoft and therefore would not allow for independence from the brand of the database. *Id.* ¶ 38. Paladyne decided nonetheless to use them. *Id.* When Wynter later created a new golden copy for STPenable, he did not use these procedures. *Id.* Further, Paladyne's stored procedures are incorporated within the golden copy database itself, whereas the standard query language and Java code utilized by STPenable to load its golden copy resides outside of the database. *Id.* ¶ 39. Finally, Paladyne's golden copy includes data about securities – such as swaps and baskets – for which subscription information on pricing, terms, and conditions is not available; STPenable's golden copy contains none of this material. *Id.* ¶ 40.[6] *Id.* In light of all of these facts, STPenable's golden copy database itself disproves Paladyne's allegation of misappropriation – because it does not share with Paladyne's model any element that is even arguably proprietary.[7]

---

[6]    Conversely, STPenable's golden copy contains information relating to municipal bonds and mortgage-backed and asset-backed securities that does not appear in Paladyne's golden copy database. Wynter Dec. ¶ 41. Wynter derived this information from newly-available subscription feeds that, to the best of his knowledge, Paladyne does not receive. *Id.*

[7]    Agranov also makes the extraordinarily vague assertion that at some point Wynter "began asking questions about the architecture and processes of the Golden Copy that went beyond what STPenable would need to understand for the purpose of providing second level of support to Paladyne." Agranov Dec. ¶ 8. That assertion is plainly insufficient to offer any support to Paladyne's misappropriation claim. As Wynter notes, "[c]ertainly there were instances in which [he] asked questions about the context of a part of Paladyne's model or what data was to be loaded into it, but this was always part of [his] job, never for the purpose of designing [his] own golden copy database." Wynter Dec. ¶ 30. Indeed, Wynter "was

In short, STPenable built its golden copy database without using any proprietary information, and it did so within a month's time, consistent with the norm for a technically expert data modeler with an in-depth knowledge of the securities financial industry. Indeed, creating a golden copy database using feeds from Reuters and similar vendors is easier than a "reverse engineering" effort – which is also legally permissible – because there is no need to work backwards from the product, since the product itself consists almost entirely of public data. Reverse engineering a product to determine its design specifications is permissible "so long as the means used to get the information necessary to reverse engineer is in the public domain, and not through the confidential relationship established with the maker or owner of the product." *Kadant*, 244 F. Supp.2d at 38. In *Kadant*, the plaintiff's misappropriation argument was premised on the same theory relied upon by Paladyne in this case, and the court's rationale in rejecting the plaintiff's application for a preliminary injunction applies with equal force here. The court reasoned:

> Plaintiff has presented no evidence that the means used by defendants to obtain the alleged trade secret were improper or dishonest. In short, it has no evidence [defendant] actually stole the design specifications. It instead necessarily relies upon an inference – that the only way defendants could develop, market, and sell their products in so short of time is if [defendant] stole the design specification information – that is, as far as the evidence to this points shows, [ ] unjustified. Plaintiff does not seem to argue that reverse engineering is impossible, just that it would take a great deal of time, skill, and expense, and that the lack thereof demonstrates that the design specifications must have been stolen. Defendants have argued that the plaintiff's products were simple, consisting of non-technical and few parts, that reverse engineering would take little time, and that, in any event, they only reverse engineered a small fraction, not all, of plaintiff's products. Plaintiff has not sufficiently rebutted these contentions. Thus,

more than qualified to do that on [his] own, without the assistance of [] Agranov or Paladyne." *Id.*

23

> because plaintiff has failed to make a clear showing that
> defendants improperly obtained and reverse engineered its
> products, trade secret protection at this stage of the litigation is
> improper.

*Id.*

As in *Kadant*, Paladyne's showing as to misappropriation, consisting almost entirely of an inference regarding the timing of Wynter's creation of STPenable's golden copy database, falls way short of the mark. Because Paladyne has not demonstrated a likelihood of prevailing on its claim that STPenable misappropriated any aspect of Paladyne's version of the golden copy database, its application for injunctive relief fails on this basis as well.

## 2.      The Breach of Contract Claim

Under New York law, the elements of a breach of contract claim are:  (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach. *See Marks v. New York University*, 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999).  Here, Paladyne and STPenable are parties to the Solution Integrator Agreement, which contains a confidentiality provision that by its terms would prohibit STPenable from misappropriating Paladyne's trade secrets. *See* Shalaby Dec., Ex. A.

Paladyne, however, has not demonstrated a likelihood of proving that STPenable misappropriated any aspect of its golden copy database.  Accordingly, for all the reasons discussed *supra* Section C.1, Paladyne also cannot show a likelihood of success on its claim that STPenable breached the Agreement's confidentiality provision.  To support its breach of contract claim, as well as its trade secret claim, Paladyne relies "only on inferences and assumptions that flaunt the clear showing required for the granting of preliminary injunctive relief . . . . [P]laintiff's bare allegations, without more, are insufficient for the issuance of a

preliminary injunction." *See Kadant*, 244 F. Supp.2d at 40 (denying preliminary injunction as to breach of contract claim) (quotation omitted).

### 3.    The Unfair Competition Claim

Paladyne's unfair competition fails for the same reasons.  Under New York common law, a plaintiff must show the misappropriation of the "labors and expenditures of another," to the defendant's "commercial advantage," in "bad faith."  *See Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988 (GEL), 2007 WL 1732427, at *4 (S.D.N.Y. June 14, 2007) (dismissing unfair competition claim where plaintiff's allegations "fail to identify any misappropriation of labor, expenditure, or commercial advantage"); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp.2d 492, 500 (S.D.N.Y. 2002) (listing elements and dismissing unfair competition claim based on trade secret misappropriation).

For all the reasons discussed *supra* Section C.1, Paladyne has failed to demonstrate a likelihood of success on its claim that STPenable misappropriated Paladyne's labors or expenditures for its commercial advantage.  Nor, for the same reasons, has it demonstrated bad faith on the part of STPenable.  To the contrary, Wynter created STPenable's golden copy database from the ground up precisely to avoid any claim that it had misused any aspect of Paladyne's golden copy database.

### D.    Paladyne Has Failed to Raise Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation, and the Balance of Hardships Tips Decidedly in Favor of STPenable

For the reasons discussed *supra* Section C, Paladyne cannot establish under the factual circumstances of this case that its database merits trade secret protection or that STPenable misappropriated any aspect of that database.  Given the extremely vague and conclusory nature of its submissions, Paladyne has not even raised sufficiently serious questions on the merits to make them a fair ground for litigation.

In any event, however, the balance of hardships in this case tips decidedly in STPenable's favor. Paladyne faces no threat to its business interests in the absence of injunctive relief because nothing proprietary to the company has been taken from it by STPenable. The company, moreover, is expected to generate ten million dollars in revenue this year, *see* Shalaby Dec. ¶ 3, and its attempted showing regarding the economic consequences it faces in the absence of injunctive relief, *see id.* ¶ 28, is extremely speculative, premised upon vague assertions about the possible diversion of customers. *See, e.g., Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (holding balance of hardships tipped against movant and affirming denial of preliminary injunction, where movant sought to enjoin an entire product line of opposing party, "far outweighing" the speculative possibility of harm to movant); *Albert v. Avery, Inc.*, 724 F. Supp. 245, 251 (S.D.N.Y. 1989) (holding balance of hardships tipped against movant and denying preliminary injunction, where non-movant faced possible bankruptcy as result of proposed injunction and movant's harm was "deferred and speculative"). Further, "plaintiff's harm, which . . . is merely prospective as opposed to the concrete harm that defendant[] would suffer, would be at least somewhat remedied by money damages if it were to prevail on the merits at trial," *Kadant*, 244 F. Supp.2d at 39.

In sharp contrast, STPenable favors severe economic hardship if the TRO remains in effect or a preliminary injunction is granted. STPenable is a small company, with a single employee, and its business absolutely depends upon its ability to service its few clients with a golden copy database. Wynter Dec. ¶ 55. Under the terms of the injunction sought by Paladyne, STPenable would be unable to perform virtually any of its business operations without danger of violating the order, and any injunction constraining its ability to utilize its

26

own golden copy database would be similarly devastating to its business. *Id.* Given the strong imbalance in the relative hardships presented here and the dramatic consequences for STPenable's financial viability posed by the restraining order, and in light of Paladyne's failure to establish a likelihood of success on the merits of its claims, the TRO should be lifted and the preliminary injunction should be denied. *See, e.g., Kadant*, 244 F. Supp.2d at 39 (denying request for preliminary injunction, where "[d]efendants are a smaller company, with fewer customers and a lesser reputation," and a "preliminary injunction disallowing the marketing and sale of products would effectively shut down" a division of the company in its entirety).

## CONCLUSION

The temporary restraining order should be lifted and plaintiff's motion for a preliminary injunction should be denied.


Dated:  October 17, 2007
     New York, New York

          SPEARS & IMES LLP

       By:  _David Spears_
          David Spears
          Sara L. Shudofsky
          Debra A. Karlstein
          Justin Deabler

          51 Madison Avenue
          New York, New York  10010
          (212) 213-6996

          *Attorneys for Defendant STPenable, Ltd.*