David Spears
Debra A. Karlstein
Sara L. Shudofsky
Justin Deabler
Spears & Imes LLP
51 Madison Avenue
New York, New York 10010
(212) 213-6996
*Attorneys for Defendant STPenable, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| PALADYNE SYSTEMS, Inc., a Delaware Corporation, | Case No. 07 CIV 8421 (LAP) |
| Plaintiff, | |
| v. | |
| STPENABLE, LTD., a United Kingdom Company | |

-----------------------------------------------------------x

## DECLARATION OF DAVID WYNTER

David Wynter declares as follows:

1.  I am the Managing Director of defendant STPenable, Ltd., a United Kingdom Company ("STPenable"), and make this declaration in opposition to plaintiff Paladyne System Inc.'s Order to Show Cause seeking a preliminary injunction. STPenable is a software designer and consultant that, among other things, markets and sells a unique "golden copy" database that is similar in certain respects to the numerous other golden copy databases on the market but is <u>not</u> stolen from Paladyne's golden copy database or any of its trade secrets. Although I was exposed to, and have some knowledge about, Paladyne's golden copy, STPenable's golden copy is unique and original.

2.    Further, although plaintiff's papers claim trade secret protection for both its golden copy and its security master, Paladyne does not and cannot contend that STPenable ever marketed anything even remotely resembling Paladyne's security master, which is a software application that permits users to view and search data. This case is only about golden copies.

3.    Critically, Paladyne does not identify with any degree of particularity what aspects of its golden copy database it considers to be confidential or entitled to trade secret protection. As discussed in detail below, "golden copy" is not a term that is proprietary or unique to Paladyne; any number of software providers offer some version of a golden copy database, which essentially amasses information about securities assembled from multiple sources available to the general public by subscription. Without any idea of what exactly Paladyne contends that I have stolen from its golden copy, I am faced with the difficult task of trying to prove a negative – *i.e.,* that STPenable's golden copy does not use any material that is proprietary to Paladyne.

4.    Nonetheless, because the preliminary injunction sought in this action would be devastating to STPenable's ability to do business, I have attempted to set forth below the steps that I have taken to create an original golden copy and the ways in which the database that STPenble has marketed and licensed is new and unique and does not replicate anything that could conceivably be Paladyne's confidential trade secret.

My Background and Technical Expertise

5.    I have nearly 30 years of practical experience in the areas of computer programming and systems as an architect/designer/data modeler of systems and software.

6.    After two years studying electrical and electronic engineering at the University of Melbourne in Australia, I started my career as a computer field service engineer and then a

manager at companies such as NCR (National Cash Register), System One, and Circulas Limited. I was also employed by Bank of America as a senior systems analyst, where I worked on the development of a software system that received batches of cheque transactions and processed them according to the different European government requirements for central bank reporting and clearing bank processing. I worked for DataStream International as a senior systems analyst and project manager, and managed delivery software for their financial information service.

7.      I have also provided computer consulting services to numerous companies, such as Telestra (where I worked on a project to automatically activate service orders and then served as an analyst mapping processes and data for nearly all of their telecommunications products), Eastern Energy (where I designed software to provide price offer quotations for electricity and energy products), IBM GSA (where I mapped the process used for service orders), and Firstwave Technologies Ltd. (where I managed a team designing a CRM web application).

8.      Notably, I consulted for Reuters for nearly two years on various projects and products, including Reuters' financial data feeds. Through my personal development of a new application and the technical documentation on how to implement financial data feeds, I became very familiar with Reuters' subscription data feed products.

9.      In January 1991, I founded a start-up company called Scribasoft Pty. Ltd (later known as roamware Pty. Ltd.) in Melbourne, Australia, where, among other things, I designed database models. I also designed and managed software used by mobile bankers to process mortgage applications.

10.     Finally, since 1999, I have been the managing director and architect of defendant STPenable Ltd., which, as previously noted, is a software development and consulting company.

In this business, I have designed, and supervised outside consultants in the creation and development of, various software products, including Transformer, described below.

<u>Management of Financial Market Data and STPenable's Transformer Product</u>

11.     This case involves software used by securities trading organizations such as broker-dealers and hedge funds. In order to obtain information about stocks, bonds, and other securities bought and sold on the financial markets, those entities subscribe to pay services (such as Bloomberg and Reuters) that provide "feeds" of market data. The market data feeds offer a variety of information about the issuer of a security, the type of instrument, the price at which a security last traded, corporate actions (*e.g.*, stock splits), and the like.

12.     Because the various pay services provide slightly different information in somewhat different formats, there is a need in the marketplace for software to organize and compare the data received from the multiple feeds. STPenable has designed and markets a product called Transformer, which gathers information from multiple sources regarding securities such as stocks, bonds, options, futures and indices.

13.     Specifically, Transformer compiles information about the issuer, the type of security, trading prices, and corporate events. In addition, Transformer "cleans" the data (in other words, ensures that information coming from various sources is consistent), and prepares it for uploading into other software applications. A brochure describing Transformer is annexed hereto as Exhibit A.

14.     STPenable and Paladyne entered into an agreement on November 1, 2005 which gives Paladyne a non-exclusive license to use Transformer (the "Agreement"). A copy of the Agreement has been filed under seal as Exhibit A to the Declaration of Sameer Shalaby dated September 27, 2007 ("Shalaby Dec.").

15.     Section 2.4 of the Agreement provides that "STPenable owns all the global Intellectual Property ('Transformer IP') rights to STPenable Transformer product and associated templates and any newly developed additional or derivatives components of that product or templates."

16.     On information and belief, Paladyne has incorporated Transformer into its security master software, a viewing application marketed to hedge funds that allows a user to view and search the data gathered by Transformer.

Golden Copy

17.     Plaintiff's complaint gives the misleading impression that "Golden Copy" is a term unique or proprietary to Paladyne. It is not. Generically, the phrase "golden copy" is used to refer to the official, master version of a record. *See* http://www.recordsmanagement.ed.ac.uk/InfoStaff/RMstaff/Retention/RetentionFAQs.htm (annexed hereto as Exhibit B).

18.     In the securities industry, the term "golden copy" is used to refer to a compilation of trusted data assembled from multiple sources. Annexed hereto as Exhibit C is an August 2007 article discussing the function of a golden copy database for financial institutions:

> The 'golden copy' security master – a single, centralized, trusted data source for all enterprise-wide consumers of security master data – serves to facilitate enterprise-wide management of security data and acts as a system of record for security data. This golden copy data hub receives security data from various internal sources and external data providers, applies business rules that translate, validate and enrich the data, then publishes the golden data to consuming systems such as trading systems, compliance, accounting, performance measurement, client reporting, portfolio research and so on.

*Id.* at 1.

19.     In addition to Paladyne, there are any number of companies offering data management software to the financial services industry providing the ability to produce a golden copy database. Those firms include:

- Asset Control, a "leading provider of investment data management solutions to the financial industry ...," *see* Exhibit D (press release entitled "Asset Control premiers new business-user solutions, leveraging 'Golden Copy' data for low-cost applications");

- SunGard, *see* Exhibit E (brochure for referencePoint software, which offers a "framework for the creation and control of global, enterprise-wide, "golden copy" reference and market data");

- AIM Software, *see* Exhibit F (website excerpt stating that "AIM Software used its ... data platform GAIN to implement a large-scale 'golden copy' platform for Switzerland's largest private bankers Pictet & Cie."; and

- Golden Source, *see* http://www.thegoldensource.com/securities%20&%20products.php (website excerpt stating that "GoldenSource Securities & Products is a global security master application that allows a financial institution to process issue and price information from multiple internal and external sources and to store it in a central repository ... Unique Real Time Golden Copy and Completeness functions allow a flexible delivery of the right data at the right time to the right audience.")

<u>STPenable's Development of an Original Golden Copy</u>

20.     STPenable does not market or license Paladyne's golden copy.

21.     In the course of fulfilling my contractual duties under the Agreement, I was exposed to, and became familiar with, Paladyne's golden copy database. In fact, I believed at one time that Paladyne's golden copy was subject to shared ownership with STPenable pursuant to section 2.5 of the Agreement, entitled "Shared Ownership," which states:

6

any custom development services (e.g. templates or MarketData vendor feed specific modules) requested and paid for by Paladyne will be jointly owned by Paladyne and SPTenable ("Shared IP"). This joint ownership will enable each party to freely distribute this Shared IP without financial obligations to the other party.

Shalaby Dec. at Exhibit A § 2.5.

22. In the course of my work for Paladyne under the Agreement, I was involved in numerous discussions about the evolution of its golden copy database. In addition, Paladyne "requested and paid for" me to develop portions of the model relating to corporate actions. Accordingly, throughout the first half of 2006, I believed that Paladyne's golden copy was subject to shared, or joint, ownership under the Agreement.

23. Mr. Shalaby and Mr. Agranov are incorrect, however, when they claim that I acknowledged replicating the Paladyne golden copy and selling it to a client. *See* Declaration of Vladimir Agranov dated September 27, 2007 ("Agranov Dec.") at ¶ 9; *see generally* Shalaby Dec. at ¶¶ 21-25. In a Skype, or instant messaging, "chat" conversation with Mr. Agranov in July 2006, I learned for the first time that Paladyne took the position that the golden copy database was not jointly owned with STPenable (despite the fact that in January 2006 I had designed the corporate actions model for the Paladyne golden copy schema which they did not use).

24. Immediately thereafter, I set out to create a new golden copy model from the ground up. This new and unique golden copy – not Paladyne's golden copy – is currently in the possession of a single customer, a company called Lipper Ltd. The data contained therein is obtained almost exclusively from third party subscription services such as Bloomberg and Reuters – not from Paladyne.

25. In connection with the creation of a brand new golden copy, I spent approximately one month creating an original schema (or design) containing over 1,040 columns for collecting data. The tables in the database represent well-documented information from the financial world that can be accessed on the internet, from numerous books on financial markets, and from the market data vendors' own documentation (over 2,000 pages of which I reviewed as a basis for my design).

26. The source of the data for each column in STPenable's golden copy is specified in detail in a 131-page document called a "Data Dictionary". Approximately 200 columns are used to reflect information such as the user who last changed a record, when the record was created and when it was last modified; the inclusion of this type of information is standard industry practice. With respect to the remaining over 800 columns, I can specifically document an outside, third-party source for 99% of them.

27. The suggestion that I could not have independently developed a golden copy database in one month, *see* Agranov Dec. at ¶ 12, is simply false. As previously noted, I have nearly 30 years of practical experience in computer programming and software; I have built databases "from the ground" up on numerous occasions in the past. In addition, through my consulting work at Reuters and in developing Transformer for STPenable, I have amassed comprehensive knowledge about the financial issuers and securities that are the subject of the golden copy database. A computer data modeler with a high level of technical expertise, who also has a strong background in the financial issuers and securities that are the subject of a golden copy database, could create an original version of a golden copy within a matter of weeks.

28. Although Paladyne alleges that it spent over four years developing a product, *id.*, the vast majority of that time was spent building its security master viewing application – not the golden copy database model. On information and belief, Mr. Agranov spent not more than a few months developing Paladyne's golden copy schema (it took him much longer to develop the stored procedures, *see* below at ¶ 38.)

29. Moreover, it is simply not credible that it took Paladyne years to develop a stable golden copy because I would estimate that 97% of Paladyne's database consists of information culled from publicly-available information via subscription data feeds. Only a very small portion of the Paladyne database – *e.g.*, data on swaps, baskets, and a few other data sets – was derived from information other than publicly-available data feeds like Bloomberg and Reuters. However, information about the swaps, baskets and all other asset classes reflected in Paladyne's golden copy can be found in hundreds of books on corporate finance and financial investments.

30. In an attempt to demonstrate that STPenable's golden copy must necessarily be stolen from Paladyne's, plaintiff contends that I started "asking questions about the architecture and processes of the Golden Copy that went beyond what STPenable would need to understand for the purpose of providing . . . support to Paladyne." Agranov Decl. at ¶ 8. The lack of any specificity in this allegation makes it virtually impossible for me to respond, since I have no idea what Agranov is referring to. Certainly there were instances in which I asked questions about the context of a part of Paladyne's model or what data was to be loaded into it, but this was always part of my job, never for the purpose of designing my own golden copy database. I was more than qualified to do that on my own, without the assistance of Mr. Agranov or Paladyne.

The Lipper License Agreement

31.     STPenable currently has only one customer using its golden copy model – Lipper, as noted above. It is simply false when plaintiff alleges that the product licensed to Lipper is Transformer plus Paladyne's golden copy. *See* Complaint at ¶ 25. STPenable does not use Paladyne's golden copy, nor does it use any of Paladyne's confidential or proprietary information in connection with Lipper's software.

32.     When I first began work for Lipper in June 2006, I briefly loaded onto a development machine at Lipper a version of the golden copy that contained the schema from Paladyne's model – although even then the mechanism for loading the database was completely different. *See* ¶¶ 38-39, below. As previously noted, in July 2006, I learned that Paladyne was taking the position that the golden copy was not jointly owned with STPenable. Therefore, within a month, I substituted the brand new golden copy database that I had created for STPenable, overwriting and deleting from Lipper's computer the initial version.

33.     Significantly, Paladyne admits that it has been aware of STPenable's licensing agreement with Lipper since the early spring of 2007 but did nothing – even though Mr. Shalaby believed that I had stolen Paladyne's trade secrets – because Paladyne did not consider legal action to be in the company's interests. *See* Shalaby Dec. at ¶¶ 21-24; Agranov Dec. at ¶¶ 8-10.

34.     Neither plaintiff's Complaint nor its motion papers anywhere identify precisely what aspect of its golden copy Paladyne alleges to be proprietary or confidential or what elements STPenable allegedly copied or replicated unlawfully. As a result of Paladyne's complete lack of specificity regarding its trade secret and breach of contract claims, STPenable is at a distinct disadvantage in trying to prove a negative – *i.e.*, that I did not steal its golden copy.

However, differences between Paladyne's product and the one that STPenable licenses to Lipper are abundant.

35. To begin, Lipper does not have a viewing application like the security master software that Paladyne provides.

36. In addition, with respect to the architecture and business logic of the golden copy that Mr. Shalaby refers to in ¶ 7 of his declaration, the product that STPenable licensed to Lipper is different than Paladyne's.

37. For example, STPenable uses "standard query language," a common, non-proprietary programming language, to communicate between Transformer and the golden copy database.

38. Paladyne, by contrast, uses Microsoft's SQL Server database stored procedures. I had told Paladyne in the course of my work with them that I did not think it was a good idea to use these stored procedures because: (a) they did not have the performance required to load the high volumes involved; and (b) the Microsoft stored procedure language is unique to Microsoft and therefore would not allow for independence from the brand of the database. Paladyne nevertheless decided to use stored procedures – but I did not when I created a new golden copy for STPenable.

39. Another architectural difference is that Paladyne's stored procedures are incorporated within the golden copy database itself, whereas the standard query language and Java code utilized by STPenable to load its golden copy resides outside of the database.

40. Further, Paladyne's golden copy includes data about securities – such as swaps and baskets – for which subscription information on pricing, terms and conditions is not available. STPenable's golden copy contains none of this material.

11

41.     In addition, STPenable's golden copy contains information relating to municipal bonds and mortgage-backed and asset-backed securities that does not appear in Paladyne's golden copy. I derived this information from a Reuters database which, to the best of my knowledge, Paladyne does not receive.

42.     It is true that some elements overlap, but <u>not</u> with respect to any aspects of the golden copy that are Paladyne's confidential information or trade secrets. There exists a finite number of categories of assets within the financial markets – anyone with an internet connection can learn from publicly-available sources what those types of securities (or asset classes) are and what attributes are unique to each of them. The mere fact that STPenable's golden copy and Paladyne's both contain information structured to record the same categories of assets and their unique attributes does not demonstrate that I took anything confidential from Paladyne (I did not).

<u>The Advent Software Agreement</u>

43.     STPenable has had dealings with Advent Software, the details of which are subject to a confidentiality agreement, and negotiations about a possible business combination.

44.     However, the allegation that STPenable was introduced to Advent in connection with Advent's confidential discussions with Paladyne, *see* Complaint at ¶¶ 18-19, is false. On information and belief, Paladyne and Advent had some talks regarding the possibility of a combination between them; those talks never materialized for reasons that are not known to me but which have nothing whatsoever to do with STPenable.

45.     Further, STPenable never went after Advent. To the contrary, Advent first approached me in December 2006 (well after September 2006, when Paladyne alleges that it was

in negotiation with Advent, *see* Complaint at ¶ 19) through the STPenable website's online contact form.

46.     By the time that I met Advent in December 2006, STPenable had been using its own unique golden copy for months – since July 2006, as previously noted – and it is my original golden copy that I would develop and customize for, and license to, Advent.

The June 20, 2007 E-mail

47.     Plaintiff unfairly implies that a June 20, 2007 email that I wrote to Sameer Shalaby, Sol Zlotchenko and Vladimir Agranov is somehow an admission of STPenable's liability. *See* Shalaby Dec. at ¶ 23, Exhibit B. It is not.

48.     By way of background, in mid-2007 I was in negotiations with a third party seeking to acquire STPenable; in connection with those discussions, the acquirer proposed that STPenable sell Paladyne a license for the Transfomer source code at a price of $500,000.

49.     At that time, Mr. Shalaby began to threaten me that Paladyne would go to court and seek an injunction to prevent me from doing business. I became gravely concerned about Paladyne's ability to obtain an *ex parte* restraining order that would interfere with my ability to perform STPenable's contractual obligations to Lipper, as well as the company's financial ability to retain and pay overseas lawyers in order to litigate in the United States.

50.     As a business matter, it seemed that the most cost-effective course of action for STPenable was to replace the golden copy that I was using – even though it was not replicated from Paladyne's – with an even newer version created by a third party that had never been exposed to Paladyne's golden copy and therefore could not possibly be alleged to have unlawfully stolen trade secrets.

51.     However, Mr. Shalaby withdrew the threat of litigation as soon as the potential acquirer reduced the price proposed for STPenable's sale to Paladyne of the Transformer source code from $500,000.  Suddenly, Paladyne was no longer interested in litigating over its purported trade secrets.

52.     Three months later, when I accepted a superior acquisition offer from Advent and Mr. Shalaby realized that he was not going to get the Transformer source code, Paladyne commenced an arbitration proceeding and an action in this Court seeking a temporary restraining order and a preliminary injunction.

53.     These facts lead me to believe that plaintiff's real motive in bringing the arbitration and lawsuit is not to vindicate its intellectual property rights but to exert economic pressure on me.  Upon information and belief, Paladyne desires the source code to Transformer because it does not disclose to its customers the fact that its security master software suite is largely composed of the Transformer software which Palayne does not own.  Therefore, I believe that Mr. Shalaby is bringing legal proceedings in the hopes of forcing STPenable either to sell Paladyne the Transformer source code or to file for bankruptcy so that Paladyne can get the source code out of escrow under the parties' Agreement.

The Equities Do Not Favor Injunctive Relief

54.     For all of the reasons set forth above, STPenable has not disclosed Paladyne's golden copy to Lipper, Advent, or any other prospective customer.

55.     STPenable is a small company.  I am its sole employee, and I have few customers.  My business absolutely depends upon the ability to service Lipper, to go forward with Advent, and to solicit new clients.  A preliminary injunction – as sought by Paladyne – that will prevent

me from using my own golden copy pending the outcome of plaintiff's arbitration would cripple STPenable and quite possibly result in bankruptcy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: London, England
      October 17, 2007

                                                    David Wynter