Scott D. Baker
Emily B. Kirsch (EB 4216)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PALADYNE SYSTEMS, INC., a Delaware Corporation,

        Plaintiff,

v.

STPENABLE, LTD., a UK company,

        Defendant.

---

No.: 07 CIV 8421 (LAP)

**PLAINTIFF PALADYNE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

NYLIB-457179.1

# I   INTRODUCTION

The sole purpose of this proceeding is to prevent the irreparable harm that will unquestionably result if STPenable ("STP") is allowed to sell Paladyne's trade secrets (or the fruits of those trade secrets), thus preserving the *status quo* while the parties arbitrate their dispute. But STP's Opposition remarkably ignores that very threat and instead spins an independent development defense that does not hold up under scrutiny. Put simply, it is not credible that David Wynter had extensive access to the Golden Copy database – which cost millions and took Paladyne years of effort and industry expertise to create – and yet somehow, all by himself, "independently" created his own version, suitable for immediate commercial sale and use, in just a month. STP should be preliminarily enjoined for at least the following reasons.

First, STP has failed to refute the likelihood of success Paladyne demonstrated in its moving papers on its claim for trade secrets misappropriation. Fundamentally, it is simply not believable that STP – which has *admitted* its access to and familiarity with Paladyne's Golden Copy technology – independently created its own version of Paladyne's complex database "from the ground up" in just a month. At a minimum, STP has fallen woefully short of satisfying its burden of proving independent development, as it has presented *no evidence* corroborating its alleged independent efforts, and its conclusory assertions are refuted by two Paladyne employees *and* an independent industry expert. Likewise, STP's claim that the Golden Copy is not protectable simply falls flat, as it enjoys no factual or legal support.

Second, STP has not refuted Paladyne's showing of a likelihood of success on its breach of contract and unfair competition claims. It is indisputable that STP breached its confidentiality agreement with Paladyne and is unfairly competing by using misappropriated technology as part of a competing product sold by STP to Paladyne's partners or customers at a lower price.

Third, STP cannot rebut Paladyne's showing of irreparable harm, and the balance of hardships weighs in Paladyne's favor. Most notably, STP *does not even address* the irreparable harm Paladyne cites in its moving papers: namely, the imminent sale of its Golden Copy to Advent. Presumably, STP ignores this threat because it cannot possibly refute its devastating

impact on Paladyne, as it would destroy a large segment of its market share and inhibit future growth in that market. Instead, STP asserts that Paladyne's "delay" in suing a different party, Lipper, somehow undercuts its claims of irreparable harm, even though it was *STP* which hid the true nature of that threat until recently. When Paladyne learned of the actual threat of a sale entailing complete disclosure of Paladyne's trade secrets to Advent, it filed for a TRO within one week. When balancing this threat of irreparable harm to Paladyne against the threat, if any, to STP, the balance tips sharply in Paladyne's favor.

In sum, Paladyne has met the requirements for injunctive relief. It thus respectfully requests that the Court issue a preliminary injunction to prevent any further improper use or disclosure of Paladyne's trade secrets, pending a ruling in the parties' arbitration.

## II   LEGAL ANALYSIS

### A.   STPenable Cannot Refute Paladyne's Showing Of A Likelihood Of Success On Its Trade Secrets Misappropriation Claim

#### 1.   The Golden Copy Constitutes, And Contains, Protectable Trade Secrets

STP proceeds from the false premise that the Golden Copy is not a protectable trade secret because the database contains publicly-available data. Such arguments grossly mischaracterize the trade secrets at issue and improperly conflate "data" with a "database." As explained by an independent expert in the financial technology industry, a golden copy database is far more than a mere container for raw data. [*See* Declaration of Alexander Kouperman ("Koup. Dec."), ¶¶ 16-18.] Generally speaking, the database includes complex schema, rules and business logic that create inter-relationships among the data so that they can be accessed in an efficient and useful manner by customers – all of which are *not* something that can simply be pulled from publicly-available sources. [*Id.*, ¶¶ 13-18.] Rather, a successful golden copy database includes a complex design that is the product of substantial effort, extensive testing, customer feedback, know-how and years of industry experience. [*Id.*, ¶ 16-18.]

More specifically, as described by Paladyne's CTO, Paladyne's Golden Copy includes

numerous design elements that are proprietary and constitute some of its trade secrets, including:
- The business logic and related know-how implemented in the source code that creates the interface with individual vendor databases;
- The design of the data validation processes and error notification;
- The schema which organize the data in light of functionalities needed by current hedge market clients;
- A system of "normalized" and cross-referenced identifiers for each security, which Paladyne created and for which there is no industry standard;
- A gateway between the vendor copy databases and the Golden Copy that allows for "on-demand" retrieval of certain security-related data;
- A functionality, incorporated into the architecture and design of the Golden Copy, which allows a user to research a security's historical view;
- The functionality and design of a built-in scheme of user permissions that allows users with appropriate permission levels to alter data and audit changes;
- The functionality and design of templates that can be user-defined to accommodate any kind of newly-invented instrument;
- Document management features that allow hedge fund clients to store and display actual contracts and link to a counter-party's related documents and data;
- A built-in data relationship which stores, organizes and makes available information relating to the holdings and ownership structure of an issuer.

[Declaration of Sol Zlotchenko ("Zlot. Dec."), ¶¶ 10-14.]

Moreover, even if Paladyne's Golden Copy were considered a mere compilation of publicly-available data (which it is not) without the above features, STP ignores well-established law that a trade secret may exist in a unique *combination* of components which are in the public domain. *See Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) ("*Integrated II*"). In such cases, computer programs may constitute protectable trade secrets based on the architecture of the product, or the "way in which the various components fit together as building blocks to form the unique whole." *Id.*; *accord Computer Associates Int'l v. Bryan*, 748 F. Supp. 982, 988 (E.D.N.Y. 1992); *Harbor Software, Inc. v. Applied Systems, Inc.*, 936 F.Supp. 167, 172 (S.D.N.Y. 1996).

Indeed, STP can hardly claim now that the Golden Copy and related technology are not trade secrets, given that it expressly agreed to maintain the confidentiality of such materials in its 2005 Solution Integrator Agreement ("Agreement") with Paladyne. [*See* Declaration of Sameer Shalaby in support of TRO ("Shalaby TRO Decl."), Exh. A § 9.1 (defining "Confidential Information" in a manner that clearly encompasses the Golden Copy).] These confidentiality

provisions establish STP's knowledge that the Golden Copy is a trade secret. *See Integrated Cash Management Svcs., Inc. v. Digital Trans., Inc.*, 732 F. Supp. 370, 377 (S.D.N.Y. 1989) ("*Integrated I*") ("existence of a nondisclosure agreement puts the employee on notice that the programs are considered trade secrets"). In fact, STP expressly acknowledged in the Agreement that a breach of the confidentiality provision would cause irreparable injury and that "unauthorized use or disclosure of Confidential Information" would entitle the injured party to injunctive relief. [*See* Shalaby TRO Decl., Exh. A § 9.5.]

Moreover, as Paladyne demonstrated in its moving papers, the various factors to determine whether trade secret protection exists all show that the Golden Copy's trade secrets above are protectable.[1] For example, these trade secrets are not known outside Paladyne's business, with the exception of certain strategic clients, or development partners like STP, subject to strict confidentiality agreements. [Zlot. Dec., ¶ 15.] In addition, as an industry expert confirms, the Golden Copy has substantial value both to Paladyne and competitors, as it is the unique product of years of effort, industry experience, research, and customer feedback. [*Id.*, ¶¶ 10, 16; Koup. Dec., ¶¶ 16-18, 26.] Finally, the Golden Copy's design and business processes cannot be legitimately obtained by others without substantial difficulty, effort and expertise. [*See id.*] For example, a user cannot, simply by working with the product's front end, ascertain the underlying design of the database, and there is no systematic way to "reverse engineer" its encrypted technology. [Zlot. Dec., ¶¶ 16-18; Koup. Dec., ¶ 16.]

In short, Paladyne has submitted substantial evidence that its Golden Copy database is a protectable trade secret. STP's attempt to avoid liability by mischaracterizing the trade secrets at

---

[1] Notably, STPenable makes the baseless argument that Paladyne's Golden Copy somehow lost its "secrecy" because it delayed in suing based on STPenable's license to Lipper. As discussed in Section C herein, STPenable is wrong, because (1) the product licensed by STPenable did not provide Lipper with access to the Golden Copy code or business logic, and it could not be reverse engineered, and (2) Lipper was bound by a confidentiality agreement. Moreover, it is well established that a defendant may not raise a laches defense where, as here, it intended the wrongful conduct. *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir.1981) (trademark and trade dress claims). This good-faith component of the laches doctrine is part of the fundamental principle that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).

issue should be disregarded by the Court.

### 2. STPenable Has Not Met Its Burden Of Proving Independent Development

It is well established in the Second Circuit that where, as here, a trade secrets defendant admits access to confidential information but claims independent development, the burden shifts to the defendant to show that this was in fact the case. *See Norbrook Labs. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 490 (N.D.N.Y. 2003) (defendants did not meet their burden despite alleging differences from the plaintiff's trade secrets, where the plaintiff's methods served as the prototype for the defendants' work); *Monovis v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994) (defendants' burden of proving independent development not sustained by testimony that many allegedly secret techniques were obtained from publicly-available sources); *Telerate Sys., Inc. v. Caro,* 689 F. Supp. 221, 232-233 (S.D.N.Y. 1988) (burden on independent development not sustained by claims that alleged trade secret "could" be reverse engineered, where it appeared actual means of obtaining trade secret were improper); *see also Detsis v. Victoria's Secret Store, Inc.*, 2006 U.S. Dist. LEXIS 73992, at *19 (S.D.N.Y.) (defendant claiming independent development in dispute over confidentiality agreement has initial burden to produce specific evidence tracking development and origin). STP has failed to meet this burden because it has not introduced *any* corroborating evidence of independent development.

Importantly, STP *admits* that Wynter not only had access to Paladyne's Golden Copy, but (to say the least) "became familiar" with it. [Declaration of David Wynter ("Wynter Decl."), ¶ 21.] Despite this admitted access to Paladyne's trade secrets, which took years of effort and experience to design, Wynter contends that he miraculously built his own version of this complex database in just one month, while *at the same time* working with Paladyne's product and confidential information. Wynter's arguments not only contradict the evidence, relevant case law, common sense, but his statements establish the *opposite* of independent development.

STP offers no credible evidence that it independently developed the golden copy

database, such as by "clean room" techniques.[2] Instead, Wynter provides only the unsupported allegation that he spent a month developing his own golden copy model "from the ground up," and that public materials are available.[3] [Wynter Decl. ¶ 24.] The public availability of certain materials does not negate he fact that defendant's wrongfully-obtained knowledge provided the basis for its work. *See, e.g., Norbrook*, 297 F. Supp. 2d at 490; *Monovis*, 905 F. Supp. at 1231. Because Wynter was the very person with admitted access to Paladyne's trade secrets and confidentiality obligations to Paladyne, his testimony (and STP's *only* evidence) that he alone created a new golden copy fails to satisfy the burden for independent development.

As corroborated by an independent expert, it is also simply impossible that Wynter built his own golden copy database *independently* in just one month.[4] Indeed, by the expert's account, it would take more than six months of 4-5 experts working full time to build a golden copy, including the full-time attention of an expert database modeler *and* financial products experts. [Koup. Dec., ¶ 20.] The development process also requires feedback from industry users. [*Id.*] Notably, Mr. Kouperman's analysis squares with Paladyne's own timeline for developing the Golden Copy, which took approximately two years and roughly 45 man-months, and the experience of other competitive vendors, such as Golden Source, which needed ten developers working full time for one year (120 man-months) to develop its first golden copy. [Zlot. Dec., ¶ 10; Reply Declaration of Sameer Shalaby ("Shalaby Dec."), ¶ 7; Koup. Dec., ¶ 23.]

---

[2] A "clean room" is a procedure used in the computer industry in order to prevent improper use of a competitor's technology or information during the development of a competing product. Programmers in clean rooms are provided only with the functional specifications for the desired program. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992). *See also* Roger M. Milgrim, 2-7A Milgrim On Trade Secrets: Independent (Clean Room) Development (Matthew Bender 2007) (listing factors).
[3] Wynter submits no proof for the proposition that *he himself* used publicly-available sources in his development. And indeed, this research alone would have far exceeded one month.
[4] As such, STPenable's citation to *Kadant* is inapposite. *See Kadant, Inc. v. Seeley Machine, Inc.*, 244 F.Supp.2d 19, 38 (N.D.N.Y. 2003). In *Kadant*, the plaintiff submitted no evidence proving the defendants improperly used its trade secrets or rebutting the defendants' showing that they could easily reverse engineer the plaintiff's products. *Id.* By contrast, Paladyne has submitted competent lay *and* expert testimony that Golden Copy could not be easily reverse engineered and that STPenable could not possibly independently develop such technology in one month. Nor does Wynter claim to have reverse engineered the Paladyne product.

Moreover, the purported differences between STP's golden copy and Paladyne's Golden Copy hardly qualify as evidence of independent development. As a threshold matter, STP has refused to allow to Paladyne to examine its golden copy, its documentation, or its development records (if any exist), thereby precluding an actual comparison of the two products. Regardless, Wynter's recitation of these "differences" underscores the breadth and depth of his knowledge of Paladyne's trade secrets. This knowledge gives STP a critical (and unfair) competitive edge in selling its product against Paladyne, a fact which numerous courts in this Circuit have found to support a finding of trade secret misappropriation. *See, e.g., Norbrook*, 297 F.Supp.2d at 485-88 (trial and error work by plaintiff was evidence its method was trade secret and also provided defendant with significant body of knowledge that enabled it to compete unfairly); *Inflight Newspapers, Inc. v. Magazines-In-Flight, LLC*, 990 F. Supp. 119, 123 (E.D.N.Y 1997) (finding the trade secret at issue was the process, derived from years of research, by which the finished product resulted); *Monovis*, 905 F. Supp. at 1231 (plaintiff's trade secret methods served as a valuable guide through problems and decisions faced designing a practical manufacturing technique and should be protected from wrongful misappropriation by those exposed to it in confidence). As the Second Circuit explained under similar circumstances:

> [A]lthough the components of the [manufacturing process] are available in [publicly available literature], development of the know-how . . . to operate a commercial process using such a [component] based upon information in the public domain would have required vast research, at great expense in money and time, plus considerable trial and error over an extended period of time. In making its agreements with [plaintiff], it was obviously [defendant's] purpose to avoid the difficulties and the time and expense that would be required to arrive at a commercially feasible process from a synthesis of the information disclosed in the literature.

*Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp.*, 342 F.2d 737, 743 (2nd Cir. 1965). Here, as in all these cases, STP cannot escape liability merely because the technology he wrongfully obtained enabled him to make modifications to Paladyne's product.

In addition, the alleged differences between the two products are simply inconsequential. For example, as confirmed by an industry expert, it is of no consequence that STP's product is written in "standard query language" versus Microsoft SQL Server, as the language does not

determine the business logic and it is relatively easy to translate from one language to another. [Koup. Dec., ¶ 21; Zlot. Dec., ¶ 28.] Likewise, the claim that Lipper's version does not have a viewing application is irrelevant, because (1) such an application is part of the Security Master product generally, *not* the Golden Copy technology specifically at issue here, and (2) it does not mean that STP has not created one for sale (or is in the process of doing so). [Zlot. Dec., ¶ 25.] Finally, STP cannot avoid liability merely because it did not yet copy *all* of the functionality and features of Paladyne's Golden Copy (e.g., features relating to swaps and baskets), as there is already currently substantial overlap and there is reason to believe STP will add additional functionality in the near future.[5] [*Id.*, ¶ 26.]

The simple reality, as confirmed by the case law, is that even if Wynter had tried to develop his own golden copy "independently," he could not practically have done so given his extensive access to Paladyne's trade secrets. In *Integrated I*, for example, a software development company sued a competitor for misappropriation of trade secrets by the plaintiff's former employees, who developed programs for the competitor. *Integrated I*, 732 F. Supp. at 371. The defendants claimed that the new programs were created "from scratch" and "with a fresh mind." *Id.*, at 377-78. The court found that the defendants did not meet their burden of showing independent development. *Id.* As the court explained, regardless of good intentions or personal integrity, it is simply impossible for a former employee to develop a competing system without relying on his access to the employee's trade secrets, and he will thus necessarily incorporate many of the proven-workable, trade secrets of the former employer into the new competitive product. *Id.* (further citation omitted); *see also Doubleclick, Inc. v. Henderson*, 1997 WL 731413, *5 (N.Y. Sup. 1997) (given high probability of inevitable disclosure of trade secrets, court enjoined defendants from certain competitive activities for six months); *Delphine*

---

[5] Indeed, Advent's accounting software products, which are tailored for the same hedge fund market as is Paladyne's Security Master, accommodate these synthetic, contract based securities that are the hallmark of hedge funds. Advent's offer to acquire STPenable and the golden copy would only make sense if STPenable intended to incorporate this functionality in the near future in order to fully integrate the golden copy with Advent's existing products.

*Software Int'l v. Elctronic Arts, Inc.*, 1999 WL 627413, *3 (S.D.N.Y. Aug. 18, 1999).

Here, as in *Integrated I* and similar cases, Wynter could not develop a new golden copy "independently" even if he tried, given his admitted familiarity with Paladyne's Golden Copy. Indeed, common sense dictates he could not "independently" development his own golden copy where he had *contemporaneous access* to Paladyne's trade secrets and was involved in integrating his product into Paladyne Security Master. Thus, along with the actual improper use and disclosure of Paladyne's trade secrets that already has occurred, the inevitable disclosure and future use of those trade secrets provides an additional basis for enjoining STP from further use of the trade secrets with a directly competitive product.

**B.     STPenable Also Cannot Refute Paladyne's Showing Of A Likelihood Of Success On Its Breach of Contract And Unfair Competition Claims**

STP does not dispute that the Agreement prohibits it from disclosing or providing Paladyne's confidential information to a third party or from using such information for its own purposes. The only reason for access to such information under the Agreement was the parties' *joint* effort to develop Paladyne's Security Master, which incorporated STP's Transformer product. The Agreement's intent was that both parties would profit from this venture (STP still receives royalties that increase every year from Paladyne's sales of Security Master). To this end, the parties were in a close relationship for their *mutual* – not unilateral – business purposes. Paladyne's trust that Wynter would not misuse its confidential information was violated when STP indisputably breached this Agreement by using Paladyne's trade secrets, gained solely through this confidential relationship, to build a competing product. In short, Paladyne has shown a strong likelihood of prevailing on its contract claim.

In addition, STP's actions are virtually the paradigm for unfair competition. Paladyne spent millions of dollars and years of time and effort developing its Golden Copy database and cultivating the customer relationships to test and refine its product. [Shalaby Dec., ¶¶ 4-8; Zlot. Dec., ¶ 10.] STP has created its own directly competing product using Paladyne's trade secrets and confidential materials, in direct violation of its contractual obligations to Paladyne. In doing so, STP improperly gained the benefit of Paladyne's research, development and goodwill. STP's

use of Paladyne's trade secrets to sell a competing product to the same customers at a lower price is classic unfair competition. Thus, like its contract claim, the unfair competition claim also supports the requested injunction.

### C. STPenable Has Not Rebutted Paladyne's Showing Of Irreparable Harm And A Balance Of Hardships Tipping In Its Favor

Because Paladyne has demonstrated a likelihood of success on its trade secrets misappropriation claim, irreparable harm is presumed. *See North Atlantic*, 188 F.3d at 49. In addition, STP acknowledged in its Agreement with Paladyne that a breach of the confidentiality provision would cause irreparable injury and entitle the injured party to injunctive relief. [*See* Shalaby TRO Decl., Exh. A § 9.5.] Even without the benefit of these presumptions, however, STP has failed to refute the actual irreparable harm shown by Paladyne.

Indeed, STP's Opposition remarkably *does not even address* the threat of irreparable harm that actually gave rise to these proceedings: namely, STP's imminent business combination with Advent and the accompanying sale of all of Paladyne's trade secrets and/or a product developed from those trade secrets. As Paladyne has demonstrated, however, its business would be devastated if STP were allowed to deliver the Golden Copy to Advent. [*See* Shalaby Dec., ¶ 9.] Advent is the leading software provider in the hedge fund marketplace and Paladyne's Security Master is integrated with Advent's highly successful Geneva product. [*Id.*; Koup. Dec., ¶ 25.] If Advent could deliver its own Security Master product, based on the misappropriated Golden Copy from STP, it would no longer need the strategic partnership with Paladyne and Paladyne would lose its sales to Geneva customers. [*Id.*] The harm to Paladyne from this loss of market share would be devastating, resulting in the destruction of the market for approximately 25% of Paladyne's customers. [Koup. Dec., ¶ 25; Shalaby TRO Decl., ¶ 28.]

Moreover, Paladyne would also be irreparably harmed if STP were allowed to sell its misappropriated golden copy to companies other than Advent. [Shalaby Dec., ¶ 10; Koup. Dec., ¶ 26.] Such a competitive product would, at the very least, erode Paladyne's market share by allowing STP to undersell Paladyne. [*Id.*] With no overhead and development costs, STP could sell its product at a vastly, and unfairly, lower price. [*Id.*]

1.  **STPenable's Allegations Of Delay Are Disingenuous And Unsupported**

Ignoring the actual threat of irreparable harm from the imminent Advent deal, STP argues that Paladyne's claims of irreparable harm are undercut because it delayed and "stood on the sidelines" when it learned that STP "sold" its golden copy to Lipper roughly six months ago. STP's claims are both factually and legally wrong.

Paladyne did not stand by idly when it learned that STP had licensed (not sold) its golden copy to Lipper. Instead, Paladyne *quickly confronted* STP and threatened to sue over the theft of Paladyne's trade secrets. [Shalaby Dec., ¶ 12-13.] In response, in a June 2007 e-mail he now tries desperately to disavow, Wynter acknowledged that his so-called "ground up" version of the golden copy was subject to an injunction and *expressly represented* that he would have a new golden copy built by an independent third party with no access to Paladyne's technology. [*Id.*, ¶ 14; Shalaby TRO Decl., Exh. B.] Although STP now concedes it did not keep its word (and likely never intended to), Paladyne believed then that the matter was resolved based on STP's representations that it would no longer use Paladyne's Golden Copy. [Shalaby Dec., ¶ 14.] Wynter *never* told Paladyne that he simply changed his mind about his promise to have a third party develop a new golden copy. [*Id.*, ¶¶ 15-16.]

For STP to argue that Paladyne should be punished for believing STP – whose promises turned out to be misrepresentations – turns the notion of equity on its head. Consistent with basic principles of equity, however, STP cannot invoke the equitable defense of laches when STP itself is guilty of unclean hands. *See Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*, 5 Misc.3d 285, 300 (N.Y.Sup. 2004) ("equity does not favor an agent which breaches the duty of confidentiality owed to its principal."); *cf. Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 970 (S.D.N.Y. 1992), *aff'd by summ. order*, 983 F.2d 1048 (2d Cir. 1992) (defendant's unclean hands barred laches in trademark dispute); *Prison Health Services, Inc. v. Umar*, 2002 WL 32254510, *22 (E.D. Pa. 2002).

In addition, the fact that Paladyne initially refrained from suing over the Lipper deal is not a delay negating irreparable harm because there was no *actual threat* at that time. *See*

*Inflight*, 990 F. Supp. at 123 (no laches despite three month delay because plaintiff was investigating facts and did not suffer actual harm until it lost its leading client). Here, even aside from Wynter's representations, Paladyne believed there was no actual threat because (1) STP had only licensed its Golden Copy replica as part of an installation product, but had *not* provided Lipper access to the source code or underlying schema, (2) Lipper was subject to confidentiality restrictions, and (3) Lipper is not in Paladyne's core market. [Shalaby Dec., ¶ 12; Shalaby TRO Decl., ¶ 24.] Although it seemed STP had misused Paladyne's trade secrets, they were not in danger of improper disclosure or that their secrecy was otherwise in jeopardy.6 [*Id.*]

The period of alleged delay also cannot be counted against Paladyne because it was in negotiations with Wynter from June through September 2007 regarding a possible business partnership, which would have obviated any legal contest over Wynter's improper use of Paladyne's confidential information – negotiations which Wynter continued to encourage. [*Id.*, ¶ 15.] Obviously, such a combination would have rendered moot any issues with Lipper, because Lipper would have become Paldyne's customer. [*Id.*] Either these were bad faith negotiations by Wynter constituting unclean hands, as discussed above, or they were good faith discussions that cannot be considered as improper delay constituting laches. *See, e.g.*, *Kraft Gen'l Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 136 n. 12 (S.D.N.Y. 1993) (movant "should not be penalized for any delay arising out of settlement efforts"); *Computer Assocs.*, 784 F. Supp. at 987; *Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 162 (D. Conn. 1998).

Most importantly, when Paladyne finally learned that it would not combine with STP, that STP was continuing to use its version of Golden Copy, and that a sale of its trade secrets to Advent was imminent, Paladyne moved for a TRO within *one week*. As such, STP cannot credibly claim that Paladyne delayed at all once an actual threat materialized.7

---

6 For the same reasons, STPenable's claim that Paladyne took inadequate measures to protect its trade secrets is baseless. Indeed, aside from the red herring argument about Lipper, it is notable that STPenable has not even attempted to refute Paladyne's strong showing in its moving papers of numerous measures to maintain the secrecy of the Golden Copy.
7 Paladyne's actions stand in stark contrast to the plaintiff in the case STPenable primarily relies upon for its "laches" argument. *See Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d

Continued on following page

2. **The Balance Of Hardships Strongly Favors Paladyne**

Finally, as set forth in Paladyne's moving papers, the balance of hardships weighs heavily in favor of issuing the requested injunction. As noted above, STP is poised to sell Paladyne's trade secrets and/or the fruits of those secrets to a potential competitor, causing immediate and irreparable harm to Paladyne's goodwill and reputation and causing a loss of almost one quarter of Paladyne's market share. Conversely, there is no threat to any legitimate business interests of STP, and it will be allowed to continue selling its original Transformer product, during the pendency of this action.[8] Although STP's ability to generate substantial revenues from Transformer renders its cries of bankruptcy suspect, that very threat provides an additional basis for issuing the requested relief, as such action would leave Paladyne without a remedy at law. *See Brenntag Intern. Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) (recognizing and applying exception to general rule that financial damages do not constitute irreparable harm, where obligation would be owed by insolvent). In addition, STP can hardly be heard to complain about an injunction pending an adjudication on the merits, as it has purposely delayed any such adjudication by failing even to file a response in the parties' pending arbitration proceeding. Accordingly, the equities strongly favor granting the requested preliminary injunctive relief.

---

Continued from previous page

964, 968 (2d Cir. 1995). There, the plaintiff not only delayed nine months before bringing suit, but another *four* months before seeking a preliminary injunction, and there was "no suggestion" that these delays were attributable to further investigation of the alleged infringement. *Id.*
[8] It appears that at least with respect to the Lipper project, STPenable has incorporated Paladyne's code into what it now calls Transforner, Needless to say, Paladyne does not consent to STPenable's use of a tainted Transformer that now incorporates Paladyne's trade secrets.

### III   CONCLUSION

STP has not refuted the strong showing of irreparable harm, likelihood of success and balance of hardships which this Court found entitled Paladyne to the extraordinary remedy of a TRO. Accordingly, Paladyne respectfully requests that the Court issue a preliminary injunction to prevent further irreparable harm and maintain the status quo pending arbitration.

DATED:   October 24, 2007.

*/s/ Emily Kirsch*
Scott D. Baker
Emily B. Kirsch (EB 4216)
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022-7650
Telephone: 212.521.5400
Facsimile: 212.521.5450
sbaker@reedsmith.com
ekirsch@reedsmith.com

*Counsel for Plaintiff*
*Paladyne Systems, LLC*

Of Counsel:
William R. Overend
REED SMITH, LLP