Scott D. Baker
Emily B. Kirsch (EB 4216)
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400
Attorneys for Plaintiff

Of Counsel:
William R. Overend

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PALADYNE SYSTEMS, Inc, a Delaware Corporation,<br><br>　　　　Plaintiff,<br><br>v.<br><br>STPENABLE, LTD., a United Kingdom Company,<br><br>　　　　Defendant. | Case No.:07 CV 8421 (LAP) |

## REPLY DECLARATION OF SAMEER SHALABY

SAMEER SHALABY, declares as follows:

1. I am the Chief Executive Officer of Paladyne Systems, Inc. ("Paladyne"), successor-in-interest to Paladyne Systems, LLC and the plaintiff in this action. I submit this declaration in further support of Paladyne's Order to Show Cause for preliminary injunction against STPenable, Ltd ("STPenable"). The injunctive relief sought herein preserving the status quo is absolutely necessary to avoid imminent and irreparable harm to Paladyne. I have personal

knowledge of the facts set forth below, except as to those matters asserted upon information and belief, and as to those matters, I have set forth the facts that form the basis of those beliefs.

2. David Wynter claims that he does not know what trade secrets Paladyne claims have been misappropriated by him and that he himself created his own golden copy "from the ground up" with no reference whatsoever to any of Paladyne's confidential and proprietary know-how. I respectfully refer the Court to the accompanying declarations of Alexander Kouperman and Sol Zlotchenko submitted herewith for a more detailed description of our product and the trade secrets involved and the absolute impossibility of one man working alone, no matter how gifted and talented he claims to be, building a commercially viable golden copy database product in one month "from the ground up".

3. As CEO of Paladyne, I will address the value of these trade secrets in the market, the substantial investment made by Paladyne in developing these trade secrets and the irreparable harm that Mr. Wynter's theft will cause Paladyne's business.

Value of Paladyne's Confidential Information to It and to Its Competitors

4. The Golden Copy accounts for more than one-third of what comprises a full security master product. Complete security master products sell for hundreds of thousands of dollars per client/per year. A one-year license for Paladyne Security Master sells for a minimum of approximately $100,000-$200,000 (depending upon the total assets under management by the particular fund customer). Other vendors with similar products sell for substantially more since they market to larger banks and institutions with substantially more users and assets under management. Their security master products sell for approximately $500,000-$1 million or more per client/per year.

5. The value of the trade secrets involved in building a golden copy is that they allow a vendor to develop one of the most critical pieces of a saleable security master

- 3 -

product that can generate millions in annual revenues even if are limited to only five or six clients. Needless to say, this is extremely valuable to any legitimate company; even more so to a single employee operation with no apparent development costs or resources and no apparent overhead.

      6.    As described in more detail below, the value of these trade secrets to a strategically positioned company like Advent that is already established in the market as a seller of related software products is considerably greater. The synergies of being able to offer a vertically integrated suite of products would not only increase Advent's profitability exponentially, but they would also be able to eliminate the cost of their existing distributorship and partnering relationship with Paladyne.

<u>Paladyne's Investment in Developing its Golden Copy</u>

      7.    Paladyne has invested considerably in the development of its trade secrets. In 2005, Paladyne acquired the technology rights from Alexandra in a deal valued at $15 million. Today, Paladyne has approximately 75 employees, including a 6-8 person development team working on Paladyne Security Master, and an additional 10 person implementation team. A very conservative estimate puts Paladyne's development of the Golden Copy portion of Paladyne Security Master at approximately 45 man-months. I have broken down the steps of development and estimated the time in man-months attributable to each step.

- Project Management (conceptualizing, diagramming, planning) -- 8 man-months;

- Core Development (including database architecture, business logic development, transformation workflow development -- 16 man-months;

- Quality Assurance (including continuous data loads, data consistency testing) – 9 man-months;

- Product Management (User requirement gathering; client feedback gathering, use case processing, data inconsistency accumulation) – 12 man-months.

8.  These estimates do not include the work that went into each client implementation from which we learned a wealth of valuable confidential information. As described more fully in the accompanying declaration of Mr. Zlotchenko, the user feedback and the technological "battle-testing" is critical to the development of a fully functioning, bug-free, useful and desirable product. Each implementation alone takes approximately 3 man-months and Paladyne currently supports 20 customers. Thus, there are another 60 man-months that can properly be added to the 45 defined above that have contributed to Paladyne's proprietary know-how incorporated in the current state of the product (which is now in its sixth release).

Irreparable Harm

9.  If STPenable were to deliver its Golden Copy to a third party such as Advent, Paladyne's business would be destroyed. Advent is the leading software provider in the hedge fund marketplace with their fund accounting product, Geneva. Paladyne's Security Master is integrated with Geneva and Paladyne sells it to Advent's customers as a value-added product to Geneva. If Advent were to provide its own product, especially one which was developed based on Paladyne's misappropriated Golden Copy, this would take away any competitive advantage Paladyne has through partnering with Advent. In fact, it would eliminate Paladyne's ability to sell its Security Master to any Geneva customer (since most clients would prefer to deal with one large company for all its needs).

10.  Moreover, even if STPenable were to directly market a product copied from, built upon, or replicated from the misappropriation of Paladyne's trade secrets, Paladyne would be irreparably harmed. This new competitor would cut into our marketshare at the very least by underselling Paladyne. With no overhead and no development costs, Mr. Wynter would be poised to sell his competitive product at a vastly – and unfairly achieved - lower price.

- 5 -

11.  Mr. Wynter's claims that Paladyne delayed in bringing this motion for preliminary injunction are not persuasive.

12.  Paladyne first learned that STPenable planned to sell/was selling a competitive product to ours to Lipper Ltd. in Spring 2007. Although we understood that STPenable had misused our trade secrets with respect to Lipper, we did not believe the "secrecy" of Paladyne's confidential and proprietary technology to be in jeopardy. We understood the license to be for the installation product, **not access to the source code or the underlying schema and database model.** Lipper's licensed access to the front end and user interface of this product would not result in a loss of secrecy of any of Paladyne's trade secrets. We also knew that Lipper was subject to confidentiality provisions so that nothing would go further than to this one third party.

13.  Nevertheless, at this time, we did indeed make clear to Mr. Wynter that this was a misappropriation of our trade secrets, and a violation of our rights which we take very seriously. Mr. Wynter so admits. *Wynter Decl. at ¶ 49.* We did not simply ignore defendant's actions, but rather set forth our position and actively and aggressively pursued the business combination with defendant in order to eliminate any potential harm to Paladyne.

14.  In his June 20, 2007 e-mail to me *(Shalaby TRO Decl., Exhibit B )* (and the telephone conversations it confirms) Mr. Wynter admitted that the only way to independently develop an untainted golden copy would be to have an independent third party - who never had access to Paladyne's Golden Copy – build it. Based on Mr. Wynter's June 20 e-mail, I understood that if STPenable intended to market a competitive product, STPenable would proceed to have a golden copy created by such an independent third party so that there would be no risk that Paladyne's trade secrets would be used improperly. Based on this representation, Paladyne did not sue.

15. Despite this June 20 e-mail, as he now admits, Mr. Wynter never had a third party build any part of his golden copy. *Wynter Decl. ¶¶ 50-53*. Instead, Mr. Wynter led me to believe in the intervening months from June to September 2007 that Paladyne and STPenable would enter into some sort of a deal for a business partnership. I now believe that Mr. Wynter never had any intention of going through with any such deal and that his statements were merely a pretext to avoid being sued by Paladyne while he attempted to find another willing buyer for his company and for Paladyne's trade secrets. Having delayed the scrutiny of the courts he apparently decided not to follow through with his promise to have a "clean" golden copy built by a third party.

16. I first heard that defendant and Advent had entered into a letter of intent relating to such a business combination involving the disclosure and sale of our trade secrets and products derived from those trade secrets from Mr. Wynter *on or about Friday September 21, 2007.* Even Mr. Wynter admits that when he informed me about his acceptance of the acquisition offer from Advent it was the first I heard that there would be no deal with Paladyne. *Wynter Decl. at ¶52.* We responded to this imminent threat of the complete destruction of our business immediately by initiating the required arbitration proceeding and filing the instant complaint and Order to Show Cause Why a TRO and Preliminary Injunction Should Not Issue at approximately *10:00 a.m. on Friday September 28, 2007.*

17. There has been no delay.

18. For the reasons stated above, Paladyne will be competitively and irreparably harmed if the injunction does not issue. Defendant has indeed misused trade secrets misappropriated from Paladyne with respect to Lipper, Advent and other prospective customers in the form of the tainted golden copy product it is marketing and selling. It is plain that it is Mr. Wynter's intention to continue to do so. *See Wynter Decl. at ¶55.* His intentions also plainly include selling and disclosing tainted source code to the golden copy database and perhaps other

- 7 -

features as well as he seeks to enter into a business combination with Advent. Accordingly, the existing and imminent threat of irreparable harm to Paladyne is severe.

19. On the other hand, STPenable's business does not absolutely depend upon the ability to service Lipper, to go forward with the Advent deal or a similar deal, and to solicit new clients for this golden copy product he is marketing and selling. For years, STPenable ran a successful business marketing, selling, customizing and improving Transformer, the product which he developed and owns. Nothing stops STPenable from continuing this business. STPenable also has an ongoing relationship with Paladyne from which, at the very least, he continues to earn royalties for sales of Paladyne Security Master (which incorporates Transformer) to new clients (with no further obligations on the part of STPenable). STPenable has just invoiced Paladyne for $18,244 for the third quarter of 2007. Based on anticipated new client installations for the coming year, projections for royalty income to STPenable from Paladyne Security Master's use of Transformer may approach $100,000 per year. The fact that STPenable chose to taint its business to rely on misappropriated confidential information must not be asserted as a reason that a preliminary injunction should not issue against him.

- 8 -

20. Moreover, defendant has been threatening to declare bankruptcy since the initiation of this law suit and the arbitration. *See, e.g., Wynter Decl. at ¶55.* In light of the defendant's guaranteed income described in paragraph 19, above, (and I have no information about other sources of income from Transformer that STPenable may receive), I believe that such threats of bankruptcy are either mere negotiation tactics or mean that STPenable is or will be unable to respond in damages in the pending arbitration or in this litigation. Were STPenable to declare bankruptcy or render itself insolvent under such circumstances, Paladyne would be left without an adequate remedy for the acts of defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day
of October, 2007

*[signature]*
Sameer Shalaby