# EXHIBIT A

<u>Dated</u> _____ <u>2007</u>

**STPENABLE LIMITED**

**AND**

**PALADYNE SYSTEMS INC.**

**SOFTWARE LICENCE AND SERVICES AGREEMENT**

**DATE: [   ]** (the "Effective Date")

**PARTIES:**

(1)    **STPENABLE LIMITED** (registered in England and Wales under number 03842113) whose principal place of business is at Office No. 6, Western International Market Centre, Hays Road, Southall, Middlesex, UB2 5XJ ("**Licensor**"); and

(2)    **PALADYNE SYSTEMS INCORPORATED** (a Delaware corporation) whose principal place of business is at 747 Third Avenue, New York, 10017 ("**Licensee**").

**IT IS AGREED as follows:**

**1.   Definitions and interpretation**

1.1.    In this Agreement (except where the context otherwise requires) the following words and phrases shall have the following meanings:

"**Base Support Period**" means the period commencing on the date of delivery of the Software Products and continuing for a period of four (4) months;

"**Confidential Information**" means the Software Products and any information which is designated by the party disclosing it to be confidential;

"**Derivative Works**" means modifications, new products, new functionality and/or translations of the Software Products created by the Licensee using the Source Code;

"**Documentation**" means any instruction manuals, internal design specifications, customer specifications, API documentation, all training material (whether video or on-line material, or computer-based), description, compiling, testing, installation instructions and other information associated with the Software Products and the Source Code which shall be supplied by the Licensor to the Licensee, whether in electronic form or otherwise;

"**Licence Fee**" means the sum of $50,000;

"**Software Products**" means the software products and software templates listed in Schedule 1;

"**Source Code**" means the source code for the Software Products, as well as related build scripts, bug database history, source code tree history including the latest top-of-the-world of all released and unreleased source code, test material (manual and automated) and other applicable documentation and testing results;

"**Licensed Products**" means the Software Products, Documentation and Source Code;

"**Support Fee**" means the sum of $50,000;

"**Support Services**" has the meaning set out in Schedule 2;

"**Training Fee**" means the sum of $25,000;

"**Training Services**" has the meaning set out in Schedule 3; and

"**Warranty Period**" means the period from the date of delivery of the Software Products to the end of the Base Support Period.

1.2.    In the event of any conflict between the provisions of this Agreement and the provisions of Schedule 1, the provisions of this Agreement shall prevail.

## 2. <u>Licence</u>

2.1.    In consideration of payment of the Licence Fee, and subject to clause 2.2, the Licensor hereby grants to the Licensee a non-exclusive, perpetual, and irrevocable licence to use, modify, create derivative works, transfer, assign, and to license, sublicense, or sell (collectively "Use") the Licensed Products for any purpose as Licensee may wish at its sole discretion.

2.2.    Licensee's parent, and their respective affiliates and subsidiaries (individually and collectively referred to hereinafter as the "Related Company(ies)"), may Use the Licensed Products in accordance with the terms of this Agreement. In such event, any such entity shall be considered the "Licensee" as such term is used herein and shall be subject to all of the terms and conditions of this Agreement. The term "Related Company", as used herein, shall mean any corporation, partnership, joint venture, or other business entity that directly or indirectly, controls, is controlled by, or is under common control with Licensee. For purposes of the foregoing definition, "control" (including "control by" and "under common control with") shall mean ownership of, or the right to acquire; (a) not less than fifty and one-tenths percent (50.1%) of the voting stock of a corporation, (b) the right to vote not less than fifty and one-tenths percent (50.1%) of the voting stock of a corporation, or (c) not less than fifty and one-tenths percent (50.1%) ownership interest in a partnership or other business entity.

2.3.    The Licensee shall not use the "Transformer" name in public marketing material (i.e., website and other marketing collateral) in relation to the Licensed Products. Licensee agrees to replace the "Transformer" name with Licensee's own branded name.

2.4.    Licensee has no restrictions on the Use of, modification or further development from, or in addition to the Licensed Products, including without limitation that Licensee may embed the Licensed Products in other offerings by it to its end users, sublicense the Licensed Products to end users as part of Licensee's product offerings, or create derivative works from the Licensed Products which Licensee may then sublicense or sell (for royalties or royalty-free). For purposes of clarity, Licensor shall have no interest or ownership rights in the derivative works created by Licensee or its agents from the Licensed Products.   Licensee may Use and combine the Licensed Products and such derivative works and modifications with other programs and/or materials to form an updated work, or create additional computer programs that operate in combination with the Licensed Products, or alone.  Licensor agrees that all right, title and interest in and to said derivative works, modifications or additional computer programs (including, without limitation, the source code for said derivative works, modifications or additional computer programs and the right to own all copyrights and patents for said derivative works, modifications or additional computer programs developed by Licensee or a third party  working on behalf of Licensee, and any data used in combination with, or output derived from the Use of the Licensed Products or said derivative works, modifications or additional computer programs) shall vest in Licensee and shall be the sole and exclusive property of Licensee.

2.5.    Notwithstanding anything to the contrary contained herein, the license granted pursuant to this Agreement allows Licensee and the Related Companies to Use the Licensed Products, without limitation.  This Section 2 sets forth some of the additional rights that Licensee has to change, modify, transfer or otherwise Use the Licensed Products in its sole discretion.

2.6.    All rights and licenses granted under or pursuant to this Agreement by Licensor to Licensee are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "Code"), licenses to rights to "intellectual property" as defined under the Code.  The parties hereto agree that Licensee, as licensee of such rights under this Agreement, including the licenses, shall retain and may fully exercise all of its rights and elections under the Code.  The parties hereto further agree that, in the event of the commencement of bankruptcy proceedings by or against Licensor under the Code, Licensee shall be entitled to retain all of its rights under this Agreement, including any licenses granted hereunder, as long as Licensee abides by all material terms and conditions of this Agreement.

2.7.    The parties also agree that Licensee shall be entitled to retain all of its rights under this Agreement, including all licenses granted hereunder, in the event that: (i)        Licensor is insolvent or is unable to pay its debts as they fall due, or is deemed unable to pay its debts within the meaning of Section 123 of the Insolvency Act 1986; or (ii) Licensor ceases or threatens to cease to carry on business;

or (iii) Licensor makes any voluntary arrangement with its creditors or has an administrator appointed; or (iv) Licensor goes into liquidation; or (v) Anything analogous to any of the foregoing under the law of any jurisdiction occurs in relation to Licensor.

2.8.    Licensee has the right to make as many copies of the Licensed Products as Licensee deems necessary at it sole discretion.

2.9.    The Licensor shall allow the Licensee to place the Licensed Products in escrow for the benefit of any of Licensee's customers, at Licensee's sole discretion.

## 3.  Documentation

3.1.    For so long as the Support Services are provided to the Licensee, if the Documentation is revised or additional Documentation is developed by the Licensor, the Licensor shall provide such Documentation to the Licensee free of charge.

3.2.    Licensee shall have the right to copy the whole or any part of the Documentation as it deems necessary, in its sole discretion.

## 4.  Delivery

4.1.    The Licensor shall deliver, via the Internet, the Licensed Products to the Licensee within five days following execution of this Agreement or as soon as reasonably practicable after such date. The parties agree to memorialize the Source Code as of such date in order to establish a base from which Licensee may make modifications, derivatives and additions.   All such modifications, derivatives and additions shall be the intellectual property rights of Licensee. Licensor shall work with Licensee to successfully compile and test the test the Source Code for Use with the Software Products to verify accurate and complete delivery of the Source Code (the "Initial Verification").

## 5.  Training

5.1.    The Licensor shall provide to the Licensee the Training Services in consideration of the Training Fee.

5.2.    The Training shall take place, at the discretion of the Licensee, either remotely, via the internet and/or teleconferencing or at the Licensor's offices in London, UK.

5.3.    Licensee may video or audio tape for Licensee's own use any training session provided by Licensor and may reproduce any associated Documentation, manuals, and coding sheets for Licensee's own use.

## 6. Support Services

6.1.    During the Base Support Period, the Licensor shall provide, unless specifically agreed in writing otherwise, the Support Services, defined in Schedule 2 attached hereto, to the Licensee in consideration of payment of the Support Fee.

6.2.    Licensor shall provide, during Licensee's normal working hours, general consultation and problem resolution assistance to Licensee, via telephone or other electronic communications approved by Licensee at commercially timely and reasonable times to be agreed by the parties hereto.

6.3.    Licensor will provide the services described in the Licensor's standard support agreement set forth in Schedule 2 attached hereto.

6.4.    Licensor shall be obligated to correct any failure of the Licensed Products to operate in accordance with the Documentation.

6.5.    Continued provision of the Support Services may be available upon completion of the Base Support Period, subject to the mutual written agreement of the Parties and for a further fee to be determined by the Licensor.

## 7. Payment and payment terms

7.1.    The Licence Fee shall be due and payable by the Licensee at the completion of the Initial Verification.

7.2.    The Licensee shall pay to the Licensor the Training Fee in consideration for the Training Services, which shall be due and payable upon the completion of the Base Support Period.

7.3.    The Licensee shall pay to the Licensor the Support Fee in consideration for the Support Services, which shall be due and payable upon the completion of the Base Support Period.

7.4.    The Licensor will invoice the Licensee for the amount of the Licence Fee, the Support Fee and the Training Fee when such sums fall due.  If the Licensee does not pay any sums due under this Agreement within 30 days of the date of the relevant invoice, the Licensor reserves the right to charge interest at a monthly rate on all sums outstanding until payment in full is received whether before or after judgement at a rate of 1% per month.  The Licensor reserves the right to claim interest under the Late Payment of Commercial Debts (Interest) Act 1998.

## 8. Indemnification

8.1.    Subject to clauses 8.3 and 8.4, in the event of any claim being brought against the Licensee or any Related Companies that the normal Use or possession of the Licensed Products in accordance with this Agreement infringes the copyright of a third party, the Licensor hereby indemnifies and will keep indemnified the Licensee against any damages that are awarded to be paid to any such third party in respect of a claim and any losses, costs (including all legal fees) and expenses incurred by or on behalf of the Licensee or Related Company provided that the Licensee:

8.1.1.    shall as soon as reasonably practicable notify the Licensor in writing of any such claim of which it becomes aware;

8.1.2.    does not make any admission as to liability or compromise or agree any settlement of any claim without the prior written consent of the Licensor, which consent shall not be unreasonably withheld or delayed, or otherwise prejudice the Licensor or any other third party's defence of any claim; and

8.1.3.    upon payment of Licensee's its reasonable costs, gives the Licensor and such other third parties as the Licensor shall direct all reasonable assistance with the conduct or settlement of any such negotiations or litigation.

8.2.    The Licensor shall have the right to select counsel in connection with the conduct or settlement of all negotiations or litigation arising from any claim, subject to the approval of Licensee. The Licensor shall have the right to control the conduct or settlement of all negotiations and litigation arising from any claim, but will consult with Licensee or its counsel regularly with respect thereto and will provide Licensee with any and all documents or information relating to the claim as requested by Licensee. Notwithstanding anything to the contrary, Licensor shall not enter into any settlement affecting Licensee's legal rights or the legal rights of a Related Company without the prior written consent of Licensee.

8.3.    In the event of a claim that the Use by the Licensee of the Licensed Products in accordance with the provisions of this Agreement infringes the copyright of a third party, the Licensor shall have the right in its absolute discretion and at its own expense:

8.3.1.    to procure the right for the Licensee to continue using the Software Products and/or the Source Code and/or the Documentation in accordance with the terms of this Agreement;

8.3.2.    to make such alterations, modifications or adjustments to the Software Products and/or the Source Code and/or the Documentation so that they become non infringing; or

8.3.3.  to replace the Software Products and/or the Source Code and/or the Documentation with non-infringing software products and/or documentation.

8.4.   In the event that the Licensor is unable to resolve the claim by taking one of the actions under clause 8.3 the Licensee shall have the right to terminate this Agreement and Licensor shall refund to Licensee all License Fee, Support Fee, and Training Fee paid under this Agreement.

8.5.   In the event of any claim attributable to the Use or possession by the Licensee of the Software Products and/or the Source Code and/or the Documentation other than in accordance with the provisions of this Agreement, the provisions of clauses 8.2 to 8.4 shall not apply and Licensee shall indemnify the Licensor against all liabilities, costs and expenses which the Licensor may incur as a result of such claim.

## 9.  Warranties

9.1.   The Licensor warrants that the Software Products will during the Warranty Period under normal Use conform in all material respects with the functionality outlined in the Documentation.  If the Licensee notifies the Licensor in writing of any material failure of the Software Products so to conform during the Warranty Period the Licensor shall at its own expense and sole option either correct any demonstrable failure in the Software Products within a reasonable time or upon return of the Software Products, the Source Code and the Documentation provide or authorise a refund of the Licence Fee and the other payments referred to in clause 7 to the Licensee.

9.2.   The Licensor warrants that it will provide the Training Services and the Support Services using reasonable care and skill and the Licensee's sole remedy against the Licensor for any failure to so provide the Training Services and the Support Services shall be to require the Licensor to correct such failure free of additional charge and within a reasonable time.

9.3.   The Licensor warrants that the Source Code and Documentation will be sufficient to enable a reasonably skilled programmer to use, understand, reproduce, maintain, modify and enhance the Software Products without reference to any other person or documentation whether in eye-readable or machine readable form and without the need for any external modification.

9.4.   The Licensor warrants that none of the Software Products include any open source software or code, general public software or other similar-type "free software" or related documentation, except for the list of open software modules and/or programs detailed in Schedule 4.

9.5.     The Licensor warrants that none of the Software Products include any software, source code or other documentation that the Licensor licenses or sub-licenses from third parties for a fee, except for the list of software modules and/or programs detailed in Schedule 5.

9.6.     The Licensor warrants that the list of templates described in Schedule 1 represents the full list of all templates that Licensor has in its possession.

9.7.     Licensor further warrants, represents and covenants that the Source Code and Documentation provided are the latest version of the Software Product and that it materially works and functions error-free and in materially the same respect as the version that Licensee uses in production with its clients as of the Effective Date.

9.8.     Licensor further warrants, represents and covenants to Licensee that: (i) Licensor has the right to furnish to Licensee the Licensed Products and other materials covered hereunder free of all liens, claims, encumbrances and other restrictions except as stated to the contrary herein; (ii) Licensee's permitted use and possession of the Licensed Products and other materials will not be interrupted or otherwise disturbed by any entity asserting a claim under or through Licensor; (iii) the Licensed Products and Updates thereto will be free from any material defects in design, materials and workmanship; (iv) the Documentation provided by Licensor will accurately and materially describe the Licensed Products provided to Licensee hereunder and (v) any Maintenance Services or other services provided by Licensor hereunder will be performed in a professional manner by qualified, and skilled personnel.  All non-material defects known to the Licensor as of the Effective Date are listed on Schedule 6, attached hereto.

9.9.     Licensor warrants, represents and covenants that, to the best of its knowledge, each of the Licensed Products and Updates thereto shall be delivered to Licensee free of (i) any computer instructions, devices or techniques than can or were designed to threaten, infect, assault, vandalize, defraud, disrupt damage, disable, alter, inhibit or shut down the Licensed Products and/or Licensee's processing environment, including, but not limited to, other programs, data storage and computer libraries or otherwise prevent Licensee from utilizing the Licensed Products as intended (hereinafter "Virus") or (ii) computer instructions or code intended by Licensor to limit the use of such Licensed Product or Update to a particular CPU/CPUs or to cause the Licensed Products to cease functioning after a specific period of time or on a specific date (hereinafter "Disabling Device").  Licensor will maintain master copies of the Licensed Products that are free and clear of Viruses or Disabling Devices and promptly upon Licensee's request, will provide a master copy to Licensee for Licensee's use in comparing and correcting the Licensed Products in Licensee's custody or possession.

9.10.   Licensor warrants, represents and covenants that: (i) all Licensor interconnectivity to Licensee computing systems and/or networks and all attempts at same shall be only through Licensee's security gateways/firewalls; (ii) it will not access, and will not permit unauthorized persons or entities to access, Licensee computing systems and/or networks without Licensee's express written authorization and any such actual or attempted access shall be consistent with any such authorization; and (iii) it will use the latest available, most comprehensive Virus detection/scanning program as specified by Licensee prior to any attempt to access any of Licensee's computing systems and/or networks and upon detecting a Virus, all attempts to access Licensee's computing systems and/or networks shall immediately cease and shall not resume until any such Virus has been eliminated.

9.11.   Licensor represents, warrants and covenants to the Licensee that Licensor is the sole and exclusive owner of the entire right, title and interest in and to the Licensed Products, free and clear of any liens, security interests or other encumbrances, and that to the extent Licensor is not the sole and exclusive owner of all right, title and interest in and to the Licensed Products, Licensor has secured all necessary and valid licenses, consents, permissions and releases to enable Licensor to deliver the Licensed Products in accordance with this Agreement.  Following the Initial Verification, Licensee agrees not to challenge any of Licensor's rights, title or interest in or to the Licensed Products.

9.12.   EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT, ALL CONDITIONS, WARRANTIES, TERMS AND UNDERTAKINGS, EXPRESS OR IMPLIED, WHETHER BY STATUTE, COMMON LAW, TRADE PRACTICE, CUSTOM, COURSE OF DEALING OR OTHERWISE (INCLUDING WITHOUT LIMITATION AS TO QUALITY, PERFORMANCE OR FITNESS OR SUITABILITY FOR PURPOSE) IN RESPECT OF THE SOFTWARE PRODUCTS, THE SOURCE CODE, THE DOCUMENTATION AND PROVISION OF THE TRAINING AND THE SUPPORT SERVICES ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMISSIBLE BY LAW.

## 10. Limitation of liability

10.1.   Nothing in this Agreement shall exclude or restrict the liability of either party to the other for death or personal injury resulting from the negligent act of one party or for liability for any fraudulent misrepresentation by a party to this Agreement.

10.2.   SUBJECT TO THE PROVISIONS OF CLAUSES 10.1, AND 10.3 THE LIABILITY OF THE LICENSOR TO THE LICENSEE FOR DIRECT LOSS IN CONTRACT, TORT OR OTHERWISE

ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE LICENSEE'S USE OF THE SOFTWARE PRODUCTS OR THE SOURCE CODE OR THE DOCUMENTATION OR THE PROVISION OF THE TRAINING AND/OR THE SUPPORT SERVICES SHALL BE LIMITED FOR ANY ONE INCIDENT OR SERIES OF CONNECTED INCIDENTS TO 120% (ONE HUNDRED AND TWENTY PER CENT) OF THE SUMS PAID UNDER THIS AGREEMENT TO THE LICENSOR BY THE LICENSEE].

10.3.    SUBJECT TO THE PROVISIONS OF CLAUSE 10.1, IN NO CIRCUMSTANCES SHALL THE LICENSOR BE LIABLE TO THE LICENSEE WHETHER IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE IN RESPECT OF LOSS OF PROFITS, REVENUE, GOODWILL, BUSINESS OPPORTUNITY, LOSS OF OR COST OF RESTORATION OF DATA OR FOR USE OF ANY RESULTS OBTAINED BY USE OF THE SOFTWARE PRODUCTS OR ANY OTHER INDIRECT, CONSEQUENTIAL, FINANCIAL OR ECONOMIC LOSS OR DAMAGE COSTS OR EXPENSES WHATEVER OR HOWEVER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE LICENSEE'S USE OF THE SOFTWARE PRODUCTS OR THE SOURCE CODE OR THE DOCUMENTATION.

10.4.    IF ANY OF THE LIMITATIONS ON THE LICENSOR'S LIABILITY UNDER THIS AGREEMENT ARE ADJUDGED TO BE UNREASONABLE IN THE CIRCUMSTANCES, THEN SUCH LIMITATION SHALL BE INCREASED TO THE AMOUNT THAT THE LICENSOR CAN RECOVER FROM ITS INSURER FOR THE LOSS IN QUESTION.

10.5.    None of the limitations of liability set forth herein shall have the effect of limiting the enforcement of or Licensee's available remedies under the Stipulation and Order dated _____ entered into by the parties as part of a settlement of the litigation captioned: *Paladyne Systems, Inc. v. STPenable LTD*, 07 Civ. 8421, brought in Federal District Court for the Southern District of New York.

## 11. Taxes

11.1.    The Licensee shall pay (in accordance with clause 11.2 below) all taxes levied by a duly constituted taxing authority against or upon the Software Products or their use, or arising out of this Agreement, including, but not limited to Value Added Tax ("**VAT**") and/or any similar, additional or replacement duty, levy or tax applicable to the fees payable under this Agreement, or any services provided hereunder, exclusive however of personal property taxes, employment related taxes and taxes based on the Licensor's income or gross receipts, which taxes shall be paid by the Licensor. The Licensor will reasonably cooperate with the Licensee in obtaining any VAT refund available to the Licensee at the Licensee's own cost.

11.2.    The Licensee will pay any tax for which it is responsible under the terms of clause 11.1 hereof, which may be levied on or assessed against the Licensee directly, and, if any such tax is paid by the Licensor, to reimburse the Licensor therefore, upon receipt by the Licensee of proof of payment reasonably acceptable to the Licensee.

11.3.    Licensor shall promptly notify Licensee of any tax liability or potential tax liability, and of any pending or threatened tax audit or other proceeding that could lead to the imposition of tax liability against Licensee, and shall afford Licensee reasonable opportunity (at Licensee's cost and expense) to participate in any such audit or proceeding affecting its interests.  Notwithstanding anything to the contrary contained in this Article 8, Licensee shall not be liable for (and Licensor shall pay) any tax liability imposed as a result of any audit where Licensee is not provided, and is materially adversely affected, by the lack of such notice and opportunity to participate.

## 12. Term and termination

12.1.    The licence to Use the Licensed Products granted by clause 2 above shall commence on the date of delivery of the Licensed Products.

12.2.    This Agreement shall commence upon the execution of this Agreement by both Parties and shall continue until terminated in accordance with this clause 12.

12.3.    This Agreement may be terminated immediately by either party if:

12.3.1. the other commits a material or persistent breach of any term of this Agreement which (in the case of a breach capable of being remedied) has not been remedied within 30 days of a written request to remedy the same; or

12.4.    Any termination of this Agreement shall be without prejudice to any other rights or remedies either party may be entitled to under this Agreement or at law.

12.5.    The termination of this Agreement in accordance with this clause 12 shall not terminate the perpetual licence granted to the Licensee under clause 2.1.

## 13. Confidentiality

13.1.    Neither party shall for a period of four years following the date of this Agreement:

13.1.1. divulge or communicate to any person, company, business entity or other organisation;

13.1.2. use for any purposes other than pursuant to this Agreement; or

13.1.3. through any failure to exercise due care and diligence, cause any unauthorised disclosure of

any trade secrets or Confidential Information relating to the other party provided that these restrictions shall cease to apply to any such information which shall become available to the public generally otherwise than through a breach of a duty of confidentiality owed to the other party and further provided that neither party shall be restricted from disclosing the Confidential Information or any part of it pursuant to a judicial or other lawful government order, but only to the extent required by such order and subject to the party obliged to comply with such order giving the other party as much notice of the terms of the order as may be reasonably practicable.

## 14. General

14.1.    The failure or delay of either party to exercise or enforce any right under this Agreement shall not operate as a waiver of that right or preclude the exercise or enforcement of it at any time or times thereafter.

14.2.    Neither Party shall use the name, logo, trade mark or other symbol of the other in advertising or publicity releases or publicly distributed materials, including without limitation, links to the other party's website, without securing the prior written consent of the other party.

14.3.    Neither party shall be liable for any delay in or for failure to perform its obligations under this Agreement, other than an obligation to make any payment due to the other party, if that delay or failure is caused by circumstances beyond the control of that party including, without limitation, fires, strikes, insurrection, riots, embargoes, regulations of any civil or military authority, acts of God, or acts of terrorism.

14.4.    This Agreement including the schedules constitutes the entire understanding between the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior Agreements, negotiations and discussions between the parties relating to it. It is being entered into in connection with the Stipulation and Order as part of a settlement between the parties of the litigation captioned: Paladyne Systems, Inc. v. STPenable LTD, 07 Civ. 8421, brought in Federal District Court for the Southern District of New York.

14.5.    This Agreement supersedes and terminates the Solution Integrator Agreement between both parties, dated November 1st, 2005.

14.6.    No variation of this Agreement shall be valid unless it is in writing and signed by an authorised representative of each of the parties.

14.7.  This Agreement may not be assigned by either party within six months of the Effective Date without the prior written consent of the other party.  However, at any time after the first six months following the Effective Date, this Agreement is freely assignable by either party without the need for consent by the other party.

14.8.  This Agreement shall be binding upon all Parties and their respective legal successors and permitted assigns.

14.9.  The Contracts (Rights of Third Parties) Act 1999 shall not apply to this Agreement, and nothing in this Agreement shall confer or purport to confer on any third party any benefit or any right to enforce any term of this Agreement or operate to give any third party the right to enforce any term of this Agreement.

14.10. If any provision of this Agreement shall be held to be unlawful, invalid or unenforceable, in whole or in part, under any enactment or rule of law, such provision or part shall to that extent be severed from this Agreement and rendered ineffective as far as possible without modifying or affecting the legality, validity or enforceability of the remaining provisions of this Agreement which will remain in full force and effect.

14.11. Any notice to be given under this Agreement shall be in writing and shall be delivered by hand, sent by first class post or sent by facsimile (such notice to be confirmed by letter posted within 12 hours) to the address of the other party set out in this Agreement (or such other address as may have been notified) and addressed in each case, for the Licensee to Sameer Shalaby, and for the Licensor to David Wynter.  Any such notice or other document shall be deemed to have been served: if delivered by hand - at the time of delivery; if sent by post - upon the expiration of 48 hours after posting; and if sent by facsimile  - at 9:00am on the next business day after the facsimile was dispatched.

15. The validity of this Agreement, the construction and enforcement of its terms, and the interpretation of the rights and duties of the parties shall be governed by the laws of the State of New York, without regard to conflicts of law rules. Any legal action or proceeding with respect to this Agreement or any other document executed or to be executed herewith, may be brought exclusively in the courts of the state of New York, county of New York, or of the United States for the Southern District of New York.  By execution and delivery of this Agreement, each signatory hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction and venue of the aforesaid courts with respect to any claim arising hereunder. Each signatory hereto hereby further irrevocably waives any claim that any such courts lack personal jurisdiction over such signatory hereto  and agrees not to plead or claim in any legal action or

proceeding with respect to the Agreement brought in any of the aforesaid courts that any such court lacks personal jurisdiction over such party. Each signatory hereto further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to any such signatory hereto at its address for notices as provided herein, such service to become effective 20 days after such mailing. Each signatory hereto irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other document that such service of process was in any way invalid or ineffective. The convention on the International Sale of Goods shall not apply to this Agreement and is hereby disclaimed.

Signed by
[NAME OF DIRECTOR/OFFICER]
on behalf of the Licensor:

} _____
Director/Authorised Signatory

Signed by [NAME OF
DIRECTOR/OFFICER]
on behalf of the Licensee:

} _____
Director/Authorised Signatory

12/4/2007

## Schedule 1

## Software Products

**Description of Licensed Product or Transformer:**

Transformer is an Enterprise Web application for managing market data feeds and any internal source of data. Transformer controls the workflow of data from an 'end of day' or intraday market data feed into a container of your choosing. In the process of managing the market data flow it is able to transform it into several different forms. For example, into your valuations database or into a file format and structure suitable for import into nearly all applications including Excel. It also manages all scheduling, communications (FTP and HTTP) and error notification. It can manage multiple phases of processing (workflow) and multiple data sources, allowing for data cleansing.

Transformer cannot automatically transform inputs to outputs in all cases, in some cases small custom Java classes must be written to achieve the transformation required. What it does do is isolate the custom logic when it is required. The major work of handling a market data feed and transforming it into your operational systems is automatically managed.

Transformer uses metadata templates for the major market data feeds. These templates include all the metadata for the feed ready loaded in Transformer and any Java classes required to enable the management of a particular vendors data feed. This management includes the collection of the feed and transformation into a database that supports a data model of Licensor and/or the clients devising. It also includes the error handling and alert notification with messaging. Transformer provides a fully managed solution. Additional templates for further data feeds can be added.

**Software Templates**

| Data Source Templates | Description | Data Vendor |
|---|---|---|
| EJV | EJV database extracts only, for these asset classes: Corp Bonds, | Reuters |

| | Pools, Deals, Tranches, ABS, MBS and CMOs | |
|---|---|---|
| DataScope Bulk Feed | Bulk FTP feed including these asset classes: Equities, Futures, Option, Options on Futures, Indices, Mutual and Money Market Funds, Warrants and DataSCope Fixed Income | Reuters |
| Bloomberg Back Office | Per Security feed – None covered. Could use Back Office schema. Back Office feed – Equity, Preferred, Commodity and Index only, CORAX. | Bloomberg |
| Mergent MuniBondSource | Entire feed | Mergent |
| IDC – SIRS | Corp Bond, CMO, Equity and DRs | IDC |
| IDC – FTS | None | IDC |
| IDC – IDSI | P0 records only. | IDC |
| IDC – IDL | Terms and Conditions feed only. | IDC |
| Mergent TaxableIncome | Not complete, not tested. Entire feed. | Mergent |
| Industrial Benchmark Classification | Dow Jones and FTSE classification, held in Reuters schema | Dow Jones |

**Schedule 2**

**Support Services**

**1    SERVICE**

1.1    Licensor will provide email and telephone support from within the United Kingdom for the Software Products between 0900 and 1300 and between 1400 and 1800 local time, Monday to Friday excluding UK public holidays. When Licensor staff are not immediately available the Licensee should make use of such alternative contact facilities provided so that Licensor can respond. The Licensee shall bear all communication costs relating to a support encounter.

1.2    Licensor undertakes to use its best endeavours to verbally or using email answer questions with the intention of assisting the Licensee in the operation and use of the Software Products in accordance with the timetables and severity level of reported problems as set forth below.

Severity 1 - Critical:  A Severity 1 problem is defined as a material system failure in the Software Products which causes a production down situation or which so substantially impairs the performance of any Core Functions or of the Software Products as a whole as to effectively render them unusable. "Core Functions" shall mean any function of the Software Products which a typical user of the Software Products would reasonably deem to be of critical importance.  For all Severity 1 errors reported by Licensee, Licensor shall acknowledge and address such reports within two (2) hours after receipt.

Severity 2 - Medium:   A Severity 2 problem is an error in the Software that impairs       the use or operation of the Software Products or a portion thereof in some way, but      does     not      effectively render the Software Products or such portion unusable as a     whole. Severity 2 problems either have available workarounds, or affect portions of      the Software Products which a typical user of the Software Products would not deem      to be a Core Function of the Software Products.  For all Severity 2 errors reported by      Licensee, Licensor shall acknowledge  and address such reports within six (6) hours      after receipt.

Severity 3 - Low: A Severity 3 problem is an error in the Software Products that  causes   a   minor inconvenience with normal operation of the Software Products in a       production environment.  For  all Severity 3 errors reported by Licensee, Licensor     shall acknowledge and address such reports within forty-eight (48) hours after     receipt.

1.3    Telephone and email support will be provided only to the named person (the "**Contact**") listed on the Licence Order Form and Licensor shall not be obliged to provide it to any person other than the Contact without the prior written consent of Licensor in advance.

1.4    Licensor will provide from time to time maintenance updates for the Software Products correcting identified faults within and adding such functional enhancements that Licensor may at its sole discretion incorporate ("**Updates**").

1.5    Licensor will provide updates to the database values ("**Metadata**") each time the data feed vendor, for which the Licensee has purchased a feed template, changes the structure of that feed.

1.6    Any services required by the Licensee beyond the scope and limitations of the agreement may be provided by Licensor or its agents at the current rates then in force or offered at the time by Licensor.

1.7    If the Licensee so requests, Licensor shall supply upgrades of the Software Products to a different version from that herein listed during the Base Support Period at  no charge and after the Base Support Period (if no other maintenance services are regularly being used) for an additional license upgrade fee that Licensor at its sole discretion may decide to charge but which is similar to what it would charge its other customers. In the event of the Licensee purchasing such upgrades the terms and conditions of this Agreement shall apply with full force and effect to the new version ("Upgrades") which shall be considered Licensed Products for purposes of this Agreement.

1.8    Licensor service in this Agreement excludes the following except as otherwise provided herein:

(a) software installation or other activities that would require the presence of its staff on the Licensee's site;

(b) customisation to the Software Products or the operation of any part of the Software Products that has been modified by the Licensee;

(b) repair of data files that can not be undertaken by standard procedures provided in the Software Products; and

(d) support for any other software program including operating system that is not listed as part of the Software Products herein.

1.9    Licensor may perform its obligations under this Agreement through agents, but it shall be responsible for the acts and omissions, and work performed by, such agents pursuant to the terms of the Agreement.

## 2    BUGS AND FEATURE ENHANCEMENTS

2.1    Licensor will be the sole judge of whether a problem encountered constitutes a Software Product error ("**Bug**"). If accepted as a Bug Licensor undertakes to use its best endeavours to rectify it in the following Update of the Software Products. In general, although not exclusively, Bugs are events or results of actions using the Software Products that do not correspond to the behaviour predicted for

the Software Products published in the Transformer User Guide, Template User Guide or on-line help.

2.2    If requested by Licensor the Licensee shall provide whatever information, reports and data as is considered reasonable by Licensor to enable the cause of a problem reported by the Licensee to be fully identified and verified by Licensor such information being held and used in strict confidence by Licensor.

2.3    Licensor has the sole discretion over the adoption of program functional changes into Updates or Upgrades. In general, enhancements are considered by Licensor to fall into the following categories:

    (a)  minor enhancements of general value to all users: Such may be incorporated into Updates of the Software Products.

    (b)  Major enhancements of general value to all users: (C) Special Licensee-specific feature enhancements: Such may be incorporated into Updates, Upgrades or as Special User Features as a commissioned programming project which the Licensee shall pay for at the current prevailing rate and falls outside the terms of this Agreement.

2.4    The Licensee agrees to exclusively use the "Licensor Problem and Feature Suggestion Form" from time to time issued for the purpose by Licensor when reporting each Bug or seeking each Software Product enhancement.

**Schedule 3**

**Training Services**

For a period of four months, the Licensor will provide Training Services to the Licensee (the "Training Period").

The parties shall agree upon a mutually acceptable time for Licensor to meet (via telephone and/or the internet) for up to one half day with a representative of Licensee to review the Software Products within two weeks of the delivery of the Software Products.

No earlier than two weeks following the delivery of the Software Products or January 7, 2008, but beginning no later than January 21, the Licensor shall provide to the Licensee ten business days, consisting of five days at each time, each day consisting of at least eight hours (at times to be reasonably agreed between the parties), of training, support and orientation for up to two employees or consultants of the Licensee so that they can, without limitation, program, utilise and operate the Software Products.

For the remainder of the four-month period, on a part time, as required basis, up to 15 hours per week (at times to be reasonably agreed between the parties), the Licensor shall provide additional instruction, training, and Support Services (as defined in Schedule 2) for the Licensee in connection with the use of the Software Products.

## Schedule 4

Open Source Code Modules –

| Library name | License type |
| --- | --- |
| ant-1.6.1.jar | Apache Software License, v2.0 |
| apache-camel-1.1.0.jar | Apache Software License, v2.0 |
| avalon-framework-4.1.4.jar | Apache Software License, v2.0 |
| avalon-framework-api-4.1.4.jar | Apache Software License, v2.0 |
| blissed-1.0-beta-3-dev.jar | Werken: http://cvs.blissed.codehaus.org/browse/~raw,r=1.4/blissed/LICENSE.txt |
| commons-beanutils-1.6.1.jar | Apache Software License, v2.0 |
| commons-codec-1.3.jar | Apache Software License, v2.0 |
| commons-collections-3.1.jar | Apache Software License, v2.0 |
| commons-configuration-1.0.jar | Apache Software License, v2.0 |
| commons-dbcp-1.2.1.jar | Apache Software License, v2.0 |
| commons-digester-1.5.jar | Apache Software License, v2.0 |
| commons-discovery-0.2-dev.jar | Apache Software License, v2.0 |
| commons-email-20030310.165926.jar | Apache Software License, v2.0 |
| commons-fileupload-1.0.jar | Apache Software License, v2.0 |
| commons-graph-0.8.2.jar | Apache Software License, v2.0 |
| commons-httpclient-3.0.1.jar | Apache Software License, v2.0 |
| commons-io-1.2.jar | Apache Software License, v2.0 |
| commons-jelly-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-bean-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-define-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-email-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-jms-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-log-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-soap-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-sql-1.0.jar | Apache Software License, v2.0 |
| commons-jelly-tags-util-1.1.1.jar | Apache Software License, v2.0 |
| commons-jelly-tags-xml-1.1.jar | Apache Software License, v2.0 |
| commons-jexl-1.0.jar | Apache Software License, v2.0 |
| commons-jxpath-1.2.jar | Apache Software License, v2.0 |
| commons-lang-2.1.jar | Apache Software License, v2.0 |
| commons-logging-1.0.4.jar | Apache Software License, v2.0 |
| commons-net-1.4.1.jar | Apache Software License, v2.0 |
| commons-pool-1.2.jar | Apache Software License, v2.0 |
| dom4j-1.5.2.jar | BSD |
| ecs-1.4.2.jar | Apache Software License, v2.0 |
| excalibur-component-1.1.jar | Apache Software License, v2.0 |
| excalibur-instrument-1.0.1.jar | Apache Software License, v2.0 |
| excalibur-logger-1.0.1.jar | Apache Software License, v2.0 |
| excalibur-pool-1.2.jar | Apache Software License, v2.0 |
| groovy-all-1.0.jar | Apache Software License, v2.0 |
| groovysoap-all-1.0-0.3-snapshot-jdk1.5.0.jar | Apache Software License, v2.0 |
| javamail-1.3.2.jar | Sun Common Development and Distribution License cddl-license.in-license.dir |
| jaxen-1.1-beta-8.jar | Werken: http://jaxen.org/license.html |
| jaxen-pxe-1.1-beta-2.jar | Werken: http://jaxen.org/license.html |
| jaxrpc-1.1.jar | Sun Common Development and Distribution License cddl-license.in-license.dir |
| jaxrpc-qname-patch-1.1.jar | Sun Common Development and Distribution License cddl-license.in-license.dir |
| jcs-20030822.182132.jar | Apache Software License, v2.0 |
| jdbc2.0.jar | Sun Common Development and Distribution License cddl-license.in-license.dir |
| jdbcappender.jar | Apache Software License, v2.0 |
| jdom-1.0.jar | Apache Software License, v2.0 |
| jndi-1.2.1.jar | Sun Common Development and Distribution License cddl-license.in-license.dir |

| | |
|---|---|
| jtds-1.2.jar | LGPL |
| log-1.0.3.jar | Apache Software License, v2.0 |
| log-2.0.0-asl.jar | Apache Software License, v2.0 |
| junit-3.8.1.jar | Apache Software License, v2.0 |
| log4j-1.2.8.jar | Apache Software License, v2.0 |
| mysql-connector-java-3.1.10-bin.jar | LGPL |
| ognl-2.6.7.jar | OGNL, see ognl license in licenses directory |
| ojdbc14.jar | OTN Development and Distribution License Agreement, see oddla.license in license directory |
| oro-2.0.7.jar | Apache Software License, v2.0 |
| plexus-0.7.jar | Apache Software License, v2.0 |
| plexus-scheduler-1.0-alpha-5.jar | Apache Software License, v2.0 |
| poi-2.5.1.jar | Apache Software License, v2.0 |
| quartz-all-1.6.0.jar | Apache Software License, v2.0 |
| saaj.jar | Sun Common Development and Distribution License cddl.license in license.dir |
| servicemix-audit-3.1.1-incubating.jar | Apache Software License, v2.0 |
| servicemix-core-3.1.1-incubating.jar | Apache Software License, v2.0 |
| servicemix-jbi-3.1.1-incubating.jar | Apache Software License, v2.0 |
| servicemix-services-3.1.1-incubating.jar | Apache Software License, v2.0 |
| soap.jar | Sun Common Development and Distribution License cddl.license in license.dir |
| sqljdbc.jar | sqljdbc.license in the licenses directory |
| stax-1.1.2-dev.jar | Apache Software License, v2.0 |
| stax-api-1.0.jar | Apache Software License, v2.0 |
| stratum-1.0-b5.jar | Apache Software License, v2.0 |
| torque-3.1.1.jar | Apache Software License, v2.0 |
| torque-gen-3.1.1.jar | Apache Software License, v2.0 |
| trove.jar | LGPL |
| turbine-2.3.1.jar | Apache Software License, v2.0 |
| velocity-1.3.1.jar | Apache Software License, v2.0 |
| velocity-dvsl-0.45.jar | Apache Software License, v2.0 |
| village-2.0.jar | Apache Software License, v2.0 |
| wsdl4j-1.5.2.jar | Common Public License, see cpl-1.0.5.license in licenses directory |
| wstx-asl-2.9.1.jar | Apache Software License, v2.0 |
| xalan-2.5.1.jar | Apache Software License, v2.0 |
| xerces-impl-2.6.0.jar | Apache Software License, v2.0 |
| xfire-all-1.2.2.jar | Apache Software License, v2.0 |
| xfrd.jar | BSD |
| xmlapis-2.0.2.jar | Apache Software License, v2.0 |
| xmlParserAPIs-2.0.2.jar | Apache Software License, v1.1 |
| xmlrpc-1.2-b1.jar | Apache Software License, v2.0 |
| xpp3-1.1.3.4d_b4_min.jar | See xpp3.license in license directory |
| xstream-1.1.3.jar | BSD |

**<u>Schedule 5</u>**

Third-Party Software Licensed

None

**Schedule 6**

| Type | Status | Number | Description | Code Region |
|------|--------|--------|-------------|-------------|
| Critical | | | None | |
| | | | | |
| Incomplete feature | Not allocated | 4 | Mule ESB was replaced due to a change to license, changed to Apache Camel. Currently only coding has been done, no testing and no integration with the "send a record as name value pairs via ESB" nor distributed Transformer support. | |
| Non Critical | Not allocated | 5 | Numbering on chained exception recorded record errors is incorrect, out by one, if limit is 400 errors before aborting processing for that file then often 401 errors shown in the .err file | |
| Non Critical | Not allocated | 6 | .err file for file based data source sometime record an error record from the previous file, with the correct(?) error record line number for that file | |
| Non Critical | Not allocated | 7 | When a domain value mapping that is missing is detected it is not recording the actual value missing in the constructed error message sent via email | |
| | | | | |
| Nice to have | Not allocated | 9 | Conversion to Java 5 not complete, HashMap and all Set based objects need to be parameterized | |